## C. J. HENDRY CO. ET AL. *v.* MOORE ET AL., AS THE FISH AND GAME COMMISSION OF CALIFORNIA.

No. 60. Argued November 10, 1942.—Decided February 8, 1943.

*Mr. Alfred T. Cluff,* with whom *Mr. Arch E. Ekdale* was on the brief, for petitioners.

*Messrs. Everett W. Mattoon,* Assistant Attorney General of California, and *Eugene M. Elson,* Deputy Attorney General, with whom *Mr. Earl Warren,* Attorney General, was on the brief, for respondents.

MR. CHIEF JUSTICE STONE delivered the opinion of the Court.

The Fish and Game Commission of California, having seized a purse net while it was being used for fishing in the navigable waters of the state in violation of the State Fish and Game Code, brought the present proceeding under § 845 of the Code for forfeiture of the net. The question for decision is whether the state court's judgment, directing that the net be forfeited and ordering the commission to sell or destroy it, is a "common law remedy" which the "common law is competent to give" within the statutory exception to the exclusive jurisdiction in admiralty conferred on district courts of the United States by § 9 of the Judiciary Act of 1789, 1 Stat. 76–77, 28 U. S. C. §§ 41 (3) and 371 (Third).

Section 845 of the California Fish and Game Code declares that a net used in violation of the provisions of the Code is a public nuisance and makes it the duty of any arresting officer to seize the net and report its seizure to the commission. The statute requires the commission to institute proceedings in the state superior court for the forfeiture of the seized net and authorizes the court, after a hearing and determination that the net was used unlawfully, to make an order forfeiting it and directing that it be sold or destroyed by the commission.

In this case the commission seized the net while it was being used by the fishing vessel *Reliance* in navigable coastal waters of the state in violation of §§ 89 and 842, which prohibit fishing by net in the area in question, and respondents, the members of the commission, brought this proceeding in the state superior court for the forfeiture of the net. Petitioners appeared as claimants and after a trial the court gave judgment that the net be forfeited, ordering respondents to sell or destroy it. The Supreme Court of California at first set the judgment aside, but after rehearing affirmed, 18 Cal. 2d 835,

118 P. 2d 1, holding that the remedy given by the judgment is a "common law remedy" which "the common law is competent to give," and that the case is not within the exclusive jurisdiction in admiralty conferred on the federal courts by the Judiciary Act and hence was properly tried in the state court. Cf. *Knapp, Stout & Co.* v. *McCaffrey,* 177 U. S. 638; *The Hamilton,* 207 U. S. 398, 404; *Red Cross Line* v. *Atlantic Fruit Co.,* 264 U. S. 109, 123. We granted certiorari, 316 U. S. 643, the question being of importance in defining the jurisdiction of state courts in relation to the admiralty jurisdiction.

Only a single issue is presented by the record and briefs—whether the state is precluded by the Constitution and laws of the United States from entertaining the present suit. It is not questioned that the state has authority to regulate fishing in its navigable waters, *Manchester* v. *Massachusetts,* 139 U. S. 240; *Lawton* v. *Steele,* 152 U. S. 133, 139; *Lee* v. *New Jersey,* 207 U. S. 67; *Skiriotes* v. *Florida,* 313 U. S. 69, 75; and it is not denied that seizure there of a net appurtenant to a fishing vessel is cognizable in admiralty. But petitioners insist that the present proceeding is not one which can be entertained by a state court since the judgment *in rem* for forfeiture of the net is not a common law remedy which the common law is competent to give, and that the case is therefore not within the statutory exception to the exclusive admiralty jurisdiction of the federal courts. In this posture of the case, and in the view we take, we find it necessary to consider only this contention.

Section 371 (Third) of 28 U. S. C., derived from § 9 of the Judiciary Act of 1789, confers exclusive jurisdiction on the federal courts "of all civil causes of admiralty and maritime jurisdiction, saving to suitors in all cases the right of a common-law remedy where the common law is competent to give it . . ." A characteristic feature of the maritime law is its use of the procedure *in rem* derived from

the civil law, by which a libellant may proceed against the vessel, naming her as a defendant and seeking a judgment subjecting the vessel, and hence the interests of all persons in her, to the satisfaction of the asserted claim. Suits *in rem* against a vessel in cases of maritime tort and for the enforcement of maritime liens are familiar examples of a procedure by which a judgment *in rem* is sought, "good against all the world."

The question whether a maritime cause of action can be prosecuted in the state courts by such a procedure was first discussed by this Court seventy-seven years after the adoption of the Constitution and the Judiciary Act, in *The Moses Taylor,* 4 Wall. 411, which held that a lien upon a vessel, created by state statute, could not be enforced by a proceeding *in rem* in the state courts. Decision was rested on the ground that exclusive jurisdiction of the suit was vested in the federal courts by the Judiciary Act, since a judgment *in rem* to enforce a lien is not a remedy which the common law is competent to give, a ruling which has since been consistently followed. *The Hine* v. *Trevor,* 4 Wall. 555; *The Belfast,* 7 Wall. 624; *The Glide,* 167 U. S. 606; *The Robert W. Parsons,* 191 U. S. 17, 36-38; *Rounds* v. *Cloverport Foundry Co.,* 237 U. S. 303, 307–08. Eleven years earlier this Court in *Smith* v. *Maryland,* 18 How. 71, without discussion of the point now at issue, had sustained the seizure and forfeiture of a vessel in a state court proceeding *in rem,* all pursuant to state statutes, for violation of a Maryland fishing law within the navigable waters of the state. The Court declared that the statute, which prescribed the procedure *in rem* in the state court, conflicted "neither with the admiralty jurisdiction of any court of the United States conferred by Congress, nor with any law of Congress whatever" (p. 76). The authority of that decision has never been questioned by this Court.

The common law as it was received in the United States at the time of the adoption of the Constitution did not afford a remedy *in rem* in suits between private persons. Hence the adoption of the saving clause in the Judiciary Act, as this Court has held in the cases already cited, did not withdraw from the exclusive jurisdiction of admiralty that class of cases in which private suitors sought to enforce their claims by the seizure of a vessel in proceedings *in rem*. But to the generalization that a judgment *in rem* was not a common law remedy there is an important exception. Forfeiture to the Crown of the offending object, because it had been used in violation of law, by a procedure *in rem* was a practice familiar not only to the English admiralty courts but to the court of Exchequer. The Exchequer gave such a remedy for the forfeiture of articles seized on land for the violation of law. And, concurrently with the admiralty, it entertained true proceedings *in rem* for the forfeiture of vessels for violations on navigable waters.[1] Such suits in the Exchequer were begun on information and were against the vessel or article to be condemned. Under the provisions of many statutes the suit might be brought by an informer *qui tam,* who was permitted to share in the proceeds of the for-

---

[1] We are not concerned here with the question whether the admiralty jurisdiction was fully concurrent with that of the Exchequer even in the case of seizures on navigable waters. During the historic struggle between the admiralty and the common law courts, the latter sought, with varying success, to restrict the admiralty jurisdiction to the high seas and to exclude it from harbors, estuaries, and other arms of the sea. See Justice Story's elaborate discussion in *DeLovio* v. *Boit*, 2 Gall. 398, especially at 425 *et seq.; Waring* v. *Clarke*, 5 How. 441; Mears, The History of the Admiralty Jurisdiction, in 2 Select Essays in Anglo-American Legal History, p. 312, especially pp. 353, *et seq.;* Roscoe's Admiralty Practice (5th ed.), pp. 4–15; Marsden, Introduction, 2 Select Pleas in the Court of Admiralty (11 Selden Soc. Publ.); Marsden, Law and Custom of the Sea,.vol. 2, pp. vii–xxii. Compare Hoon, The Organization of the English Customs System 1696-1786, p. 276.

feited article; the judgment was of forfeiture and the forfeited article was ordered to be sold. This was the established procedure certainly as early as the latter part of the seventeenth century.[2] Proceedings *in rem,* closely paralleling those in the Exchequer, were also entertained by justices of the peace in many forfeiture cases arising under the customs laws (see Hoon, The Organization of the English Customs System, 1696–1786, pp. 277, 280–83), and the Act of 8 Geo. I, c. 18, § 16, placed within that jurisdiction the condemnation of vessels up to fifteen tons charged with smuggling.

While the English Acts of Navigation and Trade and numerous other forfeiture statutes conferred jurisdiction on all the English common law courts of record[3] to enter-

---

[2] Blackstone, Commentaries, Bk. III, p. 262; Sir Geoffrey Gilbert, A Treatise on the Court of Exchequer (1758) pp. 180–91; "B. Y.", Modern Practice of the Court of Exchequer (1730) pp. 139–50; Hale, Treatise, printed in Hargrave's Law Tracts (1787), vol. 1, pp. 226–27. See also Harper, The English Navigation Laws, ch. 10; Hoon, The Organization of the English Customs System 1696–1786, ch. 8.

For some 18th century cases in the Exchequer involving the condemnation of ships, see *Idle qui tam* v. *Vanheck,* Bunb. 230; *Attorney General* v. *Jackson, id.* 236; *Scott qui tam* v. *A'Chez,* Park. 21; *Mitchell qui tam* v. *Torup, id.* 227; *Attorney General* v. *Le Merchant,* 1 Anstr. 52; *Attorney General* v. *Appleby,* 3 Anstr. 863. See also cases referred to in Masterson, Jurisdiction in Marginal Seas, pp. 42, 68–71; Reeves, Law of Shipping and Navigation (2d ed. 1807) pp. 197–208.

[3] Statutory provision for the forfeiture of nets or boats used in unlawful fishing may be found as early as 1285, Act of 13 Edw. I, c. 47. See also 1 Eliz. c. 17; 3 Jac. I, c. 12; 13 & 14 Car. II, c. 28; 15 Car. II, c. 16, § 1 (5), (8); 1 Geo. I, c. 18. The Act of 15 Car. II, c. 16, § 1 (8), provided for the forfeiture of seines or nets used in Newfoundland harbors, to be recovered "in any of His Majesty's courts in Newfoundland, or in any court of record in England or Wales."

The Navigation Acts commonly provided that a forfeiture proceeding might be brought, in addition to others, "in any court of record," e. g., 12 Car. II, c. 18, §§ 1, 3, 6, 18, or "in any of his Majesty's Courts of Record at Westminster," 8 Geo. I, c. 18, § 23; 6 Geo. II, c. 13, § 4. Some Acts included as the place for such suits "any Court of Admi-

tain suits for forfeiture, nevertheless suitors having ready access to the convenient procedure of exchequer or admiralty in *qui tam* actions seem to have had little occasion to resort to the King's Bench or Common Pleas. In the occasional reported forfeiture cases brought in King's Bench, the English reports give us little light on the procedure followed or the precise form of judgment entered. In one case, *Roberts* v. *Withered,* 5 Mod. 193, 12 Mod. 92, the court seems to have adapted the common law action of detinue to forfeiture cases by resort to the fiction that bringing the action was the equivalent of a seizure which vested the property in the Crown so that a suit in detinue or replevin *in personam* to gain possession would lie. See Stephen, Pleading (3rd Am. ed.) pp. 47, 52, 69, 74; Ames, Lectures on Legal History, pp. 64, 71. Cf. *Wilkins* v. *Despard,* 5 Term Rep. 112.

Separate courts exercising the jurisdiction of the Court of Exchequer were never established in the American Colonies. Instead, that jurisdiction was absorbed by the common law courts which entertained suits for the forfeiture of property under English or local statutes authorizing its condemnation. Long before the adoption of the Constitution the common law courts in the Colonies—and later in the states during the period of Confederation—were exercising jurisdiction *in rem* in the enforcement of forfeiture statutes. Like the Exchequer, in cases of seizure on navigable waters they exercised a jurisdiction concurrently with the courts of admiralty. But the vice-admiralty courts in the Colonies did not begin to function with any real continuity until about 1700 or shortly after-

---

ralty . . . or . . . any Court of Record" in the American Colonies or Plantations. E. g., 6 Geo. II, c. 13, § 3; 4 Geo. III, c. 15, § 41. The important Act of 1696 (7 & 8 Wm. III, c. 22, § 2) provided that forfeitures of ships and goods might be enforced "in any of his Majesty's courts of record at Westminster, or in any court in his Majesty's plantations, where such offence shall be committed."

140

ward. See Andrews, Vice-Admiralty Courts in the Colonies, in Records of the Vice-Admiralty Court of Rhode Island, 1617–1752 (ed. Towle, 1936), p. 1; Andrews, The Colonial Period of American History, vol. 4, ch. 8; Harper, The English Navigation Laws, ch. 15; Osgood, The American Colonies in the 18th Century, vol. 1, pp. 185–222, 299–303. By that time, the jurisdiction of common law courts to condemn ships and cargoes for violation of the Navigation Acts had been firmly established, apparently without question, and was regularly exercised throughout the colonies. In general the suits were brought against the vessel or article to be condemned, were tried by jury, closely followed the procedure in Exchequer, and if successful resulted in judgments of forfeiture or condemnation with a provision for sale.[4]

---

[4] VIRGINIA: In the 1670s forfeitures under the Navigation Acts were declared by the Council. See Minutes of the Council and General Court of Colonial Virginia, 1622–1632 and 1670–1676 (ed. McIlwaine, 1924), pp. 212, 214, 216, 242–44, 445–46. But by the 1690s such cases were tried at common law in the General Court before a jury. Although the records of the General Court were destroyed by fire during the evacuation of Richmond in 1865, copies of some of its more important proceedings during the 1690s, contemporaneously transmitted to England, have been preserved, and are reprinted in Executive Journals of the Council of Colonial Virginia (ed. McIlwaine, 1925), vol. I. See the cases of *The Anne & Catherine*, pp. 173–75; *The William & Mary*, pp. 241–43; *The Content*, pp. 379–80; *Cole* v. *Three Pipes of Brandy*, pp. 204–05; cf. *The Crane*, pp. 233–34, 300; *The Catherine*, pp. 263–64; *The Society*, pp. 196–97, 219, 235–36, 252–53. See also the cases of *The Elezabeth* and *The Mary & Ellery*, in Edward Randolph, Including His Letters and Official Papers (ed. Toppan, 1899), vol. 5, p. 139; *The Crown*, condemned by a jury at a special court in 1687, 12 Va. Mag. of Hist. & Biog. 189. The Governor exercised a power to commission a special admiralty court in the case of a prize (*The St. Ignace*, Exec. J., vol. I, pp. 366–67, 368–69), but apparently not for condemnation cases under the Acts of Navigation. An admiralty court, for Virginia and North Carolina, was es-

The rise of the vice-admiralty courts—prompted in part by the Crown's desire to have access to a forum not controlled by the obstinate resistance of American juries—did not divest the colonial common law courts of their

tablished in 1698. Id., p. 379; Chitwood, Justice in Colonial Virginia, pp. 71–73.

MARYLAND: A commission for a special court of admiralty to try forfeiture cases under the Navigation Acts for a limited period of time is to be found as early as 1684, 17 Archives of Maryland 360–62, (cf. 20 id. 72, 75, 165), some admiralty jurisdiction having previously been exercised by the Provincial Court, 49 Archives xv, xxi–xxiii. But forfeiture cases were tried generally at courts of oyer and terminer, acting with a jury. See Andrews, Vice-Admiralty Courts in the Colonies, *supra*, p. 8, n. 2; 57 Archives lvii; Morriss, Colonial Trade of Maryland 1689–1715, pp. 121–22; case of *The John*, 1687, 8 Archives 9; *The Providence*, 1692, 13 id. 320, 327 (see also Edward Randolph, vol. 5, p. 139); *The Ann of New Castle*, 1692, 8 Archives 445–47; *The Margaret*, 1692, 8 id. 489–91, and again in 1694, 20 id. 42–43, 65, 142, 184. *The Ann of Maryland* was acquitted at a special court of oyer and terminer in 1694; she was tried before the Provincial Court later the same year and acquitted by the jury; the judgment was reversed on appeal in May 1695; upon a second trial in the Provincial Court on a new information the jury again acquitted her in August 1695, but the proceedings on the second appeal are incomplete. Proceedings of the Maryland Court of Appeals 1695–1729 (ed. Bond, 1933), pp. xlvii–xlviii, 7–12, 22–24, 647–53; 20 Archives 64, 128–30, 155, 181, 188, 243–44, 438–45, 461; Edward Randolph, vol. 5, p. 139. *The Anna Helena* was acquitted by a jury in the Provincial Court, 1694, 20 Archives 134, 180–81, 383–85. See also the full report of *Blackiston qui tam* v. *Carroll*, 1692, in Proc. Md. Ct. of App., pp. 29–41, where the judgment upon a jury's verdict condemning some casks of beer in the court of oyer and terminer (p. 34) was reversed on appeal (p. 40). Compare *The Charles*, 1696, 23 Archives 3.

MASSACHUSETTS: Like the New York Mayor's Court, the Massachusetts Court of Assistants was invested with admiralty jurisdiction and it was authorized to dispense with jury trial in such cases. See Crump, Colonial Admiralty Jurisdiction in the Seventeenth Century, ch. 3; Noble, Admiralty Jurisdiction in Massachusetts, 8 Publ. Colonial Society of Mass., 150, 154–57; Davis, History of the Judiciary of Massachusetts, p. 75; argument of counsel in *Insurance Co.* v. *Dunham*, 11 Wall. 1, 8–9. Forfeiture cases under the Navigation Acts were, how-

jurisdiction to proceed *in rem* in cases of forfeiture and condemnation. The trial records have not yet been made available for all the Colonies, and in some instances perhaps can never be. But there is no reason to suppose that

---

ever, regularly tried by that court before juries, apparently in the same manner as other common law cases. Records of the Court of Assistants of the Colony of the Massachusetts Bay, 1630–1692 (ed. Noble, 1901), vol. 1, pp. 149, 150, 160, 168, 169, 170–71, 175–77, 209–10, 219, 230–31, 342–44, 355–56; and especially pp. 219–20, 349, 366, four cases—*The Swallow, The Newbery, The Two Brothers,* and *The Mary*—of trials de novo before a jury on appeal from the county court, which is not known to have been invested with any admiralty jurisdiction. The Privy Council upheld an appeal in the case of *The Two Brothers,* ordering the ship forfeited, but affirmed the judgment of the Court of Assistants releasing *The Mary,* 2 Acts of the Privy Council, Colonial, No. 480. See Edward Randolph, vols. 1–7; passim; Crump, *supra,* 140–44.

NEW JERSEY: Full records of several condemnation proceedings will be found in Journal of the Courts of Common Right and Chancery of East New Jersey, 1683–1702 (ed. Edsall, 1937). See Introduction, pp. 133–37; *The Thomas and Benjamin,* condemned on confession of judgment, 1685, pp. 192–94; *The Dolphin,* acquitted by a jury, 1685, pp. 198–200 and 138; *Goodman qui tam* v. *Dounham,* and *Goodman qui tam* v. *Powel,* calicoes condemned in default of a claimant, 1699, p. 319. See also the reference at pp. 136–37 to the condemnation of *The Unity* in 1688 in the Middlesex court of common pleas.

PENNSYLVANIA: In the closing years of the 17th century, admiralty jurisdiction in Pennsylvania was vested in the Provincial Council. Loyd, Early Courts of Pennsylvania, p. 68; Eastman, Courts and Lawyers of Pennsylvania, vol. 1, p. 165; Lewis, The Courts of Pennsylvania in the Seventeenth Century, 1 Rep. Pa. Bar Assn. 353, 383, 389. Forfeiture cases under the Navigation Acts were nevertheless tried in the common law courts. See the case of *The Dolphin,* cleared by a jury at a special court in the County of Chester, 1695, Edward Randolph, vol. 5, pp. 108–14, 139; *The Pennsylvania Merchant,* condemned by a jury in the court of common pleas at Chester, 1695, Record of the Courts of Chester County, 1681–1697 (1910) pp. 366–69. Cf. Root, The Relations of Pennsylvania with the British Government, 1696–1765, pp. 108–11.

NEW HAMPSHIRE: *The George,* condemned by a jury at a special court in 1682. Calendar of State Papers, Colonial, America and West

in this respect the judicial history of forfeiture proceedings in New York, manuscript records of which we have examined, is not typical of the others, and there is ample support for the conclusion that in the seaboard states forfeiture proceedings *in rem*, extending to seizures on navigable waters of the state, were an established procedure of the common law courts before the Revolution. It was the admiralty courts, not the common law courts, which had difficulty in establishing their jurisdiction, although in 1759 the Board of Trade was able to write that "With regard to breaches of the Law of Trade they are cognizable either in the courts of common law in the plantations, or in the courts of Admiralty, which have in such cases, if not in all, a concurrent jurisdiction with the courts of common law" (quoted in Andrews, Vice-Admiralty Courts in the Colonies, *supra*, at p. 7); and Stokes reported that the same situation prevailed at the outbreak of the Revolution. See Stokes, A View of the Constitution of the British Colonies (1783), pp. 270, 357 *et seq.*

In New York, admiralty jurisdiction was vested in the Mayor's Court in 1678, and that court continued to exercise jurisdiction in all maritime cases, including those

Indies, 1681–1685, Nos. 868–70; Edward Randolph, vol. 3, pp. 256–58. *The Hopewell* was acquitted by a jury in the court of common pleas in 1699; the cargo of *The Speedwell* was condemned by a jury in the same court in 1701, but the superior court reversed the judgment. See Andrews, Vice-Admiralty Courts in the Colonies, *supra*, pp. 10, n. 1, 49–50, and cf. p. 11, n. 1; Andrews, The Colonial Period of American History, vol. 4, p. 123; Aldrich, Admiralty Jurisdiction of New Hampshire, 3 Proc. N. H. Bar Assn. (N. S.) 31, 50–51. See also *The Industry*, cleared by a jury in 1679. Edward Randolph, vol. 3, pp. 84, 343.

CONNECTICUT: The cargo of *The Adventure* was condemned by a jury in the county court at Hartford, 1692. See 3 Coll. of the Conn. Hist. Soc., pp. 264–66 n.

MAINE: See case of *The Gift of God*, cleared by jury, 1680 (court not specified). Edward Randolph, vol. 3, pp. 85, 348. This ship was tried again in 1683. Id., pp. 350, 351.

arising under the Navigation Acts, throughout the colonial period even after the establishment of a court of vice-admiralty. See Select Cases of the Mayor's Court of New York City, 1674–1784 (ed. Morris, 1935), pp. 39–40, 566 *et seq.* But cases of forfeiture were also regularly prosecuted before the common law courts of the colony—in the General Quarter Sessions of the Peace in New York City during the 1680s,[5] and, after the reorganization of the judiciary in 1691, in the Supreme Court of Judicature,[6], which was given jurisdiction "of all pleas, Civill Criminall,

---

[5] See *Larkin qui tam* v. *Sloop Lewis*, condemned upon a confession of judgment, August 4, 1685 (Mss. in Hall of Records, N. Y. C., Pleadings K 456 and K 452), and compare Documentary History of New York (ed. O'Callaghan, 1850), vol. 1, p. 116; *Ludgar qui tam* v. *Sloop Fortune*, May 5, 1685, condemned on confession of judgment (Ms. Minutes N. Y. C. Quarter Sessions 1683/4–1693/4, fol. 40); *Meine qui tam* v. *Sloop Unity*, August 3, 1686, condemned on confession of judgment (id. fol. 93); *Santen qui tam* v. *The Two Sisters*, August 2, 1686, acquitted by the jury (id., fol. 95). See also *Ludgar qui tam* v. *Pinke Charles*, August 4, 1685, acquitted by the jury of violating an act of the provincial assembly (id., fol. 48–50).

There is some record of courts of admiralty in New York before 1700, apparently acting under special commissions. Doc. Hist. N. Y., vol. 1, p. 60, vol. 2, pp. 164–68, 172, 176–77; Crump, Colonial Admiralty Jurisdiction in the Seventeenth Century, pp. 122–24.

[6] The published Minutes of the Supreme Court of Judicature 1693–1701, 45 N. Y. Hist. Soc. Coll., disclose at least nine such cases during that period: *Brooke* v. *Barquenteen Roberts*, p. 55; *Brooke qui tam* v. *Barquenteen Orange and Jacobs*, pp. 59, 61, 62, 63, 65, 68, 73 (and see the more complete accounts of this case in Harper, The English Navigation Laws, p. 193, and in Cal. St. Pap., Col., Am. & W. I. 1693–1696, Nos. 1133, 1546, 1891 and 2033); *Brooke qui tam* v. *Iron Bars*, pp. 59, 63; *Hungerford* v. *Briganteen Swift*, pp. 154, 156, 158; *R.* v. *The Concord and Blake*, pp. 156, 160, 162; *R.* v. *Pipe Staves*, pp. 157, 158; *Hungerford* v. *East Indian Goods*, pp. 166, 176; *Hungerford qui tam* v. *Sundry Goods*, p. 168 (see the information in N. Y. Misc. Mss. Box 3, N. Y. Hist. Soc.); *Lott qui tam* v. *Sundry Goods and Allison*, pp. 168, 173, 176, 183, 184. See also a confession of judgment, October 8, 1698, on an information filed in the court in *Cortlandt qui tam* v. *The Fortune*, Hall of Records, N. Y. C., Parchment 210 G-1.

and Mixt, as fully & amply to all Intents & purposes what-
soever, as the Courts of Kings Bench, Common Pleas, &
Exchequer within their Majestyes Kingdome of England,
have or ought to have," 1 Colonial Laws of New York
(1894) p. 229.

The Navigation Acts did not constitute the only au-
thority for forfeiture proceedings in the common law
courts. New York's own colonial legislation shows fre-
quent use of the forfeiture sanction, applied sometimes
to vessels as well as to commodities, as a means of enforce-
ment of provincial laws fixing customs duties, regulating
or prohibiting the exportation or importation of commod-
ities, or requiring a specified manner of marking, storing
or selling.[7] A common provision in these statutes was
that the forfeitures imposed might be prosecuted in any
court of record in the colony.

The records of the New York Supreme Court of Judi-
cature contain numerous instances of forfeiture proceed-
ings during the eighteenth century. One is *Hammond
qui tam v. Sloop Carolina*,[8] a prosecution in 1735 for a

---

[7] See Colonial Laws of New York 1664–1775 (1894): Vol. 1, pp. 252,
291, 292, 422–23, 451, 787, 850–51, 1017, 1022. Vol. 2, pp. 20, 21, 26,
27, 28, 33, 258, 260, 284, 287, 357, 358, 424, 435, 436, 477–79, 655, 778,
800, 853, 878–79, 909–10, 963, 1055. Vol. 3, pp. 33, 79, 95, 99,
108, 113, 115, 119, 245, 250–51, 356, 361–62, 442, 569, 790–91, 949–50,
972, 975. Vol. 4, pp. 107, 366, 1092. Vol. 5, pp. 316, 364–65, 547,
836, 857–58.

[8] Hall of Records, N. Y. C., Parchments 159 D 2 (judgment roll);
Ms. Minutes Sup. Ct. of Jud. 1732–1737, fol. 172–75.

In 1739 the Supreme Court of Judicature issued a writ of prohibition
restraining prosecution of a forfeiture proceeding under 15 Car. II, c. 7,
against *The Mary and Margaret* in the court of vice-admiralty. Four
years later the Privy Council upheld the issuance of the writ, apparently
accepting the view that a seizure in any part of New York harbor
which was "within the body of the county" rather than on the high
seas came within the exclusive jurisdiction of the common law courts—
a ruling which probably left to the vice-admiralty court but a small role
in cases under the Navigation Acts, except when the particular Act

false customs certificate, which resulted in the discharge of the ship and her cargo for failure of proof. Later cases show more in detail how closely that court's procedure in forfeiture cases followed the essentials of the procedure *in rem* which had been developed in the English Exchequer.[9] Nor did the creation of a state Court of Admiralty after the Revolution effect a withdrawal of such jurisdiction from the common law courts. Statutes enacted in New York during the period of the Confederation, like the English and local legislation which preceded them, continued to employ forfeiture as a sanction,[10] and

contained an express grant of such jurisdiction (cf. Note 3, *supra*). See Reports of Cases in the Vice-Admiralty and Admiralty of New York 1715–1788 (ed. Hough, 1925) p. 16; Documents Relative to the Colonial History of New York (1855), vol. 6, pp. 154–55; 3 Acts of the Privy Council, Colonial, No. 538. See also Root, The Relations of Pennsylvania with the British Government 1696–1765, p. 117, n. 100; Washburne, Imperial Control of the Administration of Justice in the Thirteen American Colonies, 1684–1776, p. 168. Compare later cases in Hough's Reports, in which the vice-admiralty court took a similar narrow view of its jurisdiction,—*Kennedy qui tam* v. *32 Barrels of Gunpowder* (1754) p. 82; *Spencer qui tam* v. *Richardson* (1760) p. 181. See Note 1, *supra*.

[9] The following are all cases of judgments taken by default: *Harison qui tam* v. *Several Parcels of Tobacco*, Ms. Minutes Sup. Ct. of Jud., Engrossed, 1750–54, pp. 124, 127, 130 (April 23–25, 1752); *Kennedy qui tam* v. *77 Cases of Bottles, etc.*, id. 1754–57, pp. 254, 260, (April 29, 1756); *Allen qui tam* v. *Two Tons etc. of Sugar*, id. 1766–69, pp. 607–08 (January 21, 1769); *Elliott & Moore qui tam* v. *Seven Casks of Tea*, Hall of Records, N. Y. C., Pleadings K 474 (information), Parchments 120 G 1 (judgment roll) (August 1772); *Elliott & Moore qui tam* v. *Nineteen Casks of Tea, etc.*, id., Parchments 29 F 9 (August 1772); *Elliott & Moore qui tam* v. *Twenty Pipes of Wine*, id., Parchments 93 H 2 (August 1772).

[10] See Laws of New York, 1777–1801 (1886), Vol. 1, pp. 19, 112, 601 and 604, 627–28, 666–67. Vol. 2, pp. 516–17, 786, 789, 806–07. Similar legislation shortly after the adoption of the Constitution will be found in Vol. 4, p. 592; Vol. 5, p. 468.

Much of the colonial and state customs legislation before 1789 is collected in Hill, The First Stages of the Tariff Policy of the United

forfeiture proceedings continued to be brought in the Supreme Court and other common law tribunals.[11]  The Act of April 11, 1787, 2 Laws of New York 509, 517, imposing import duties, provided that "all ships and vessels, goods and merchandize which shall become forfeited by virtue of this act, shall be prosecuted by the collector, or officer or other person who shall seize the same, by information in the court of admiralty,[12] or in the court of exchequer,[13] or in any mayors court or court of common pleas in this State, in order to condemnation thereof."  There was provision for proclamations to be made "in the accustomed manner," with detailed specification of the methods of making an appraisal and proceeding to judgment, and a

States, 8 Publ. American Economic Assn., 453; Kelley, Tariff Acts under the Confederation, 2 Quarterly J. of Economics, 473; Ripley, The Financial History of Virginia 1609–1776, ch. 3.

[11] For example, see *Lamb qui tam* v. *Sylsbee*, information to condemn three thousand gallons of rum for violation of the Act of March 22, 1784 (filed September 14, 1785).  Hall of Records, N. Y. C., Parchments P 9 B 1 (issue roll).  The proceedings are incomplete, but a subsequent entry, October 27, 1785, indicates that the jury brought in a verdict for the plaintiff.  Ms. Minutes Sup. Ct. of Jud., Jan. 1785–Nov. 1785, fol. 52.

[12] During the Confederation, courts of admiralty existed in each state and appeals in prize cases were taken to the Committee of Appeals in the Continental Congress, and after 1780 to the Court of Appeals. See 131 U. S., Appendix, pp. xix–xlix; Jameson, The Predecessor of the Supreme Court, in Essays in the Constitutional History of the United States in the Formative Period, p. 1; Wiener, Notes on the Rhode Island Admiralty, 1727–1790, 46 Harv. L. Rev. 44, 59.  The New York Court of Admiralty was established in 1776 (see Hough's Reports p. xxiv), and its jurisdiction was restricted by the Act of February 14, 1787 (2 Laws of New York, p. 394).

[13] The Court of Exchequer was created by the Act of February 9, 1786 (2 Laws of New York, p. 185), to entertain only prosecutions instituted by its clerk or by the state attorney general.  It was presided over by the junior justice of the Supreme Court of Judicature, who was authorized to transfer "all cases of difficulty" to the Supreme Court of Judicature.

148

further provision (p. 518) leaving it to the discretion of the collector of the port of New York or the attorney general "to direct in which of the courts aforesaid any information shall be brought touching such forfeiture."

In Pennsylvania we have a record of a similar exercise of jurisdiction in 1787 by the Philadelphia Court of Common Pleas in *Phile qui tam* v. *The Ship Anna,* 1 Dall. 197, where the jury condemned the ship.[14]

Examination of the legislative history of the Judiciary Act of 1789 does not disclose precisely what its framers

[14] *The Fame* was condemned in the Supreme Court of Pennsylvania in 1726. Osgood, The American Colonies in the 18th Century, vol. 2, p. 541; Root, The Relations of Pennsylvania with the British Government 1696–1765, p. 169; Pennsylvania Statutes at Large, 1682–1801 (1897 ed.), vol. 4, pp. 422–26, 429–31; 6 Acts of the Privy Council, Colonial, Nos. 328, 333. For the case of *The Sarah,* acquitted at the New Castle Court of Common Pleas in 1727, see Root, p. 120; Board of Trade Papers, Proprieties 1697–1776, vol. xii, R: 119, 122 and 131 (copy in possession of the Historical Society of Pennsylvania). See also *The Richard & William,* acquitted in the Philadelphia Court of Common Pleas, 1728, id., R: 93; *The Hope,* apparently acquitted by the jury in the Philadelphia Court of Common Pleas, the collector's appeal to the Privy Council being dismissed in 1737, 3 Acts of the Privy Council, Colonial, No. 381.

A number of cases tried in the common law court in Jamaica during the Revolutionary period are reported in Grant, Notes of Cases Adjudged in Jamaica, 1774 to 1787 (one of the few known copies of this work is in the Gerry Collection of the Library of this Court). See *Rex qui tam* v. *Schooner Revenge,* p. 116; *Rex* v. *Sloop Tryal,* p. 155; *Woolfrys qui tam* v. *Ship Tartar,* pp. 156, 163; *Macfarquhar qui tam* v. *Sloop Flying Fish,* pp. 156, 188; *Flowerdew qui tam* v. *Sloop La Depeche,* p. 258; *Macallister qui tam* v. *The Greyhound,* p. 310; see also *Ex parte Oliveres Daniel,* p. 293. Compare Andrews, The Colonial Period of American History, vol. 4, p. 249, n. 3. See also cases of *The Dolphin* and *The Mercury,* condemned in the Jamaica Supreme Court of Judicature, 1742, judgments reversed and new trials ordered by the Privy Council, 1743, 3 Acts of the Privy Council, Colonial, Nos. 566–67; *The Lawrence,* condemned by the Jamaica Superior Court, 1769, reversed by the Privy Council, 1777, 5 id. No. 217.

had in mind when in § 9 they used the phrase "common law remedy." But it is unlikely that, in selecting this phrase as the means of marking the boundary of the jurisdiction of state courts over matters which might otherwise be within the exclusive jurisdiction of admiralty, the draftsmen of § 9 intended to withdraw from the state courts a jurisdiction and remedy in forfeiture cases which had been so generally applied by non-admiralty courts both in England and America, and which had become a recognized part of the common law system as developed in England and received in this country long before the American Revolution. Nor can we accept the suggestion that Congress, in this use of the phrase "common law remedy," was harking back some hundreds of years to a period before the Exchequer had taken its place as one of the three great courts administering the common law, and was likewise disregarding the experience of the common law courts in America with which it was familiar—all without any indication of such a purpose. Considerations of practical convenience in the conduct of forfeiture proceedings for violations of local statutes occurring on state waters, as well as the contemporary and later history of the exercise of the admiralty jurisdiction, indicate that there was no purpose to limit such proceedings to the exclusive jurisdiction of the admiralty.

Shortly after the adoption of the Constitution, state legislation was enacted regulating state tidal waters and authorizing forfeiture in the state courts of fish nets and vessels illegally used in fishing there. Such a statute was considered in 1823 in *Corfield* v. *Coryell,* 4 Wash. C. C. 371, Fed. Cas. No. 3230, (cited in *Smith* v. *Maryland, supra,* 18 How. at 75), where a New Jersey state court forfeiture of a vessel under a statute regulating the Delaware Bay was upheld as constitutional by Justice Washington, without question of the state court's jurisdiction because of the *in rem* nature of the proceeding. No suggestion

is to be found in that case or elsewhere that the Judiciary Act struck down the large body of state legislation, enacted shortly after 1789, which provided for the forfeiture in state courts of vessels or nets seized in navigable waters of a state for violating state fishing laws.[15]  And such legislation has become rooted in the law enforcement programs

---

[15] *The Hiram*, subject of the litigation in *Corfield* v. *Coryell* (and in *Kean* v. *Rice*, 12 Searg. & Rawl. 203), had been condemned under §§ 6 and 7 of the New Jersey Act of June 9, 1820, whose forfeiture provisions were derived from §§ 5 and 6 of the Act of January 26, 1798 (Paterson, New Jersey Laws 1703–1799, p. 263), in turn derived from §§ 2–6 of a Provincial Act of 1719, 5 Geo. I, c. 30 (Nevill, New Jersey Acts 1703–1752, pp. 86–88).  Compare the forfeiture provisions of the Delaware River fishing legislation, in New Jersey Acts of November 26, 1808, § 4, and November 28, 1822, § 13, and in Pennsylvania Acts of February 8, 1804, § 5, of February 23, 1809, and January 29, 1823; see *Shoemaker* v. *State*, 20 N. J. L. 153 (1843).

Massachusetts enacted early legislation restricting fishing in navigable waters, including Taunton Great River and the Merrimack, and providing that any nets used unlawfully should be forfeited.  Act of February 22, 1790 (forfeiture to be in a "trial in law"); Act of March 4, 1790 (forfeiture proceeding to be conducted in specified manner by justice of the peace); Act of March 27, 1793.

Delaware regulated the taking of oysters and other shellfish by the Act of February 12, 1812 (see Revised Laws, 1829, p. 274), imposed as a penalty the forfeiture of vessels and their equipment, and by § 2 provided that the condemnation proceeding should be before two justices of the peace in an action qui tam.

Rhode Island provided that, in the case of unlawful taking of oysters in any waters in the state, the vessel together with all its implements should be forfeited in an action qui tam in the court of common pleas or general sessions of the peace.  See the 1798 revision of Public Laws, pp. 488–89, derived from an Act of August 1773 (R. I. Acts and Resolves, August 1773, pp. 63–64).  Compare an Act of 1803, appearing in the 1822 revision of Public Laws, p. 516; an Act of 1802, § 1, in R. I. Public Laws 1798–1813 (Newport, printed by H. & O. Farnsworth) p. 83; Act of June 23, 1810, § 1, id., p. 194.

The 1808 compilation of the Statute Laws of Connecticut, Book I, Title LXX, Fisheries, contains several statutes passed between 1783 and 1798, regulating fishing on certain rivers, including the Connecticut, and punishing violations by both fine and a forfeiture of the seines or

of about half the states,[16] without intimation from this or any other court that the Judiciary Act prohibited it. See *Boggs* v. *Commonwealth,* 76 Va. 989, 993–96; *Dize* v. *Lloyd,* 36 F. 651, 652–53; *Johnson* v. *Loper,* 46 N. J. L. 321; *Bradford* v. *DeLuca,* 90 N. J. L. 434, 103 A. 692; *Doolan* v. *The Greyhound,* 79 Conn. 697, 66 A. 511; *Ely* v. *Bugbee,* 90 Conn. 584, 98 A. 121; *State* v. *Umaki,* 103 Wash. 232, 174 P. 447; *State* v. *Mavrikas,* 148 Wash. 651, 269 P. 805; *Osborn* v. *Charlevoix,* 114 Mich. 655, 663–66, 72 N. W. 982.

It is noteworthy that Blackstone's Commentaries, more read in America before the Revolution than any other law book, referred to the information *in rem* in the Court

---

other implements used. See c. I, §§ 7, 10, 13; c. IV, § 1; *Boles* v. *Lynde,* 1 Root 195 (1790).

See also *Trueman* v. *403 Quarter Casks etc. of Gunpowder,* Thacher's Cr. Cas., p. 14 (Boston, 1823).

[16] In addition to California, there are at least twenty-two states whose laws now make provision for the condemnation, in state court proceedings, of nets or vessels used in state waters, including navigable waters, in violation of state fishing laws. Arkansas, Pope's Digest, 1942 Suppl., § 5958; Connecticut Gen. Stat. 1930, § 3175; Delaware Rev. Code 1935, §§ 2904–2905, 2955, 2957–2958, 2990, 2991, 2993–2995, 2997, 3000–3002, 3004, 3007, 3015, 3024, 3030, 3035, 3037; Florida Stat. 1941, §§ 372.31, 374.41; Illinois Rev. Stat. 1941, ch. 56, § 109; Iowa Code 1939, §§ 1794.099–1794.102; Kentucky Rev. Stat. 1942, § 150.120; Louisiana Gen. Stat., Dart 1939, §§ 3074, 3108, 3118; Maine Rev. Stat. 1930, ch. 50, §§ 50, 81; Maryland Ann. Code, Flack 1939, art. 39, §§ 10–12, 25, 65, 66, 67, 69, 72, 73; Massachusetts Gen. Laws 1932, ch. 130, § 74; Michigan Stat. Ann., Henderson 1937, §§ 13.1221–13.1225; Minnesota Stat. 1941, § 102.06 (21); Mississippi Code Ann. 1930, § 6908; New Jersey Rev. Stat. 1937, Title 23, ch. 9, §§ 9–11, 14, 15, 20, 27–29, 32, 33, 44–46, 48, 49, 55, 63, 67, 110, 112, ch. 10, § 21; North Carolina Code 1939, § 1965 (a); Ohio Gen. Code Ann., Page 1937, §§ 1416, 1450 (see 1942 Suppl.), 1451; Oregon Comp. Laws Ann. 1940, §§ 82–347, 83–318, 83–415, 83–520, 83–523; South Dakota Code 1939, § 25.0422; Virginia Code 1942, §§ 3159, 3169 (and see ch. 131), 3171, 3176, 3180, 3182, 3188, 3206, 3214, 3248, 3305a, 3305b, 3305c; Washington Rev. Stat. Ann., Remington 1932, §§ 5692, 5671–10 (1940 Suppl.); Wisconsin Stat. 1941, § 29.05 (7).

of Exchequer as the procedure by which forfeitures were inflicted for violation of Acts of Parliament. Bk. III, p. 262. And Kent, in his Commentaries, pointed out that "seizures, in England, for violation of the laws of revenue, trade or navigation, were tried by a jury in the Court of Exchequer, according to the course of the common law; and though a proceeding be *in rem,* it is not necessarily a proceeding or cause in the admiralty" (12th ed., Vol. 1, p. 374). He declared that, within the meaning of § 9 of the Judiciary Act, the common law was competent to give such a remedy "because, under the vigorous system of the English law, such prosecutions *in rem* are in the Exchequer, according to the course of the common law" (p. 376).

Upon the adoption of the Constitution the national government took over the regulation of trade, navigation and customs duties which had been prolific sources of forfeiture proceedings in the state courts. This Court in suits brought in admiralty sustained the admiralty jurisdiction over forfeitures prescribed by Congress for the violation of federal revenue and other laws where the seizure had occurred on navigable waters. *United States* v. *La Vengeance,* 3 Dall. 297; *United States* v. *Schooner Sally,* 2 Cranch 406; *United States* v. *Schooner Betsey and Charlotte,* 4 Cranch 443; *Whelan* v. *United States,* 7 Cranch 112; *The Samuel,* 1 Wheat. 9. Those decisions held that when the seizure occurred on navigable waters the cause was maritime and hence triable without a jury in the federal courts.[17] But they obviously did not determine, and there was no occasion to determine, whether forfeiture proceedings belonged in the category of maritime causes that might also be tried in state courts be-

---

[17] Section 9 of the Judiciary Act of 1789, 1 Stat. 77, provided that "the trial of issues in fact, in the district courts, in all causes except civil causes of admiralty and maritime jurisdiction, shall be by jury."

cause, within the meaning of the saving clause, the common law was competent to give the remedy.

The Court has never held or said that the admiralty jurisdiction in a forfeiture case is exclusive, and it has repeatedly declared that, in cases of forfeiture of articles seized on land for violation of federal statutes, the district courts proceed as courts of common law according to the course of the Exchequer on informations *in rem* with trial by jury. *The Sarah,* 8 Wheat. 391, 396, n. A; *443 Cans of Egg Product* v. *United States,* 226 U. S. 172, and cases cited. In *United States* v. *422 Casks of Wine,* 1 Pet. 547, Justice Story defined such an action as a libel or information *in rem* on the Exchequer side of the court. And see Chief Justice Marshall's reference, in *Schooner Hoppet* v. *United States,* 7 Cranch 389, 393, to "proceedings in Courts of common law, either against the person or the thing, for penalties or forfeitures." In all this we perceive a common understanding of judges, lawyers and text writers, both before and after the adoption of the Constitution, of the common law nature of the procedure and judgment *in rem* in forfeiture cases and of its use in such proceedings in the Exchequer and in the American common law courts.

We conclude that the common law as received in this country at the time of the adoption of the Constitution gave a remedy *in rem* in cases of forfeiture, and that it is a "common law remedy" and one which "the common law is competent to give" within the meaning of § 9 of the Judiciary Act of 1789. By that Act the states were left free to provide such a remedy in forfeiture cases where the articles are seized upon navigable waters of the state for violation of state law. It follows that *Smith* v. *Maryland, supra,* was rightly decided and is not in conflict with *The Moses Taylor, supra,* and cases following it, and that the judgment of the Supreme Court of California should be

*Affirmed.*

MR. JUSTICE BLACK, dissenting:

If this case involved only a fishnet, I should be in-clined to acquiesce in the holding of the Court. Indeed, we have held that a state may seize and condemn a fishnet of trifling value without following the formal procedure of court action at all. *Lawton* v. *Steele,* 152 U. S. 133. But the principle laid down here involves far more than a fishnet, for under it state courts are authorized through *in rem* proceedings to seize and condemn, for violation of local law, any equipment or vessel employed in maritime activity. Today's *in rem* action is against a fishnet used in patently illegal fashion; tomorrow's may be an action against a tramp-steamer or ocean liner which violates a harbor regulation or otherwise offends against the police regulations of a state or municipality. Persons guilty of violating state laws affecting maritime activity may be prosecuted by *in personam* actions in state courts,[1] and the admiralty courts themselves can helpfully enforce state laws through *in rem* proceedings.[2] I do not believe, however, that the Judiciary Act permits states, through state common law courts which cannot reasonably be ex-pected to have knowledge of admiralty law and practice, to give permanent halt to any portion of the maritime trade and commerce of the nation by bringing *in rem* proceedings against ships.[3]

---

[1] For a fact situation analogous to the instant case in which the state protected its fishing grounds through an *in personam* action, see *Manchester* v. *Massachusetts,* 139 U. S. 240. See also, as cases concern-ing the state criminal jurisdiction in the maritime field, *United States* v. *Bevans,* 3 Wheat. 336, and *Wildenhus's Case,* 120 U. S. 1.

[2] See, e. g., as cases on liens in wrongful death actions, *The J. E. Rumbell,* 148 U. S. 1, and *The Hamilton,* 207 U. S. 398.

[3] It is particularly important in time of war, when every vessel is in constant use, that *in rem* proceedings be strictly controlled. This is partially done by the Suits in Admiralty Act, 41 Stat. 525, for a brief discussion of which see *Clyde-Mallory Lines* v. *The Eglantine,* 317 U. S. 395.

The Judiciary Act of 1789 places in the federal admiralty courts exclusive jurisdiction over admiralty cases except where the common law provides an equivalent remedy. It is conceded that as a general proposition the common law courts have no *in rem* remedy in maritime cases. However, the Court holds squarely, for the first time in its history, that there is an exception to this rule which permits states to bring *in rem* forfeiture proceedings in common law courts. The Court brushes aside as mere generalizations the many cases hereafter considered which declare that *no* equivalent of an admiralty *in rem* proceeding may be brought at common law. Today's holding is rested principally on the English and colonial practice prior to 1789 and on one case in this Court. I disagree, believing that the English practice is irrelevant, that the colonial law was not in accord with the English practice, and that a long series of cases since 1789 have clearly considered the proposition put by the Court, and have given the Judiciary Act a meaning squarely opposite to that now announced.

The English Exchequer practice on which the Court appears to rely so heavily seems to me to be irrelevant because it was not in conformity with our own early American development. The colonists, of course, did not establish admiralty courts the moment they stepped from the vessels which brought them to the New World, and for a substantial portion of the seventeenth century maritime forfeitures were collected in the fashion of the English courts. However, toward the end of that century, it became acutely apparent in England that colonial juries would not enforce the navigation laws as England desired to see them enforced. This was particularly true in Massachusetts Bay[4] and in other colonies where commercial

---

[4] "But the laws of navigation were nowhere disobeyed and contemned so openly as in New England. The people of Massachusetts Bay were from the first disposed to act, as if independent of the mother-country;

interests dominated. Hence in 1697, Vice Commissioners of Admiralty were established throughout the colonies to enforce the navigation laws of England without jury procedure. It was conceded by the earliest writers that the Vice Admiralty courts in the colonies "obtained in a singular manner a jurisdiction in revenue causes, totally foreign to the original jurisdiction of the admiralty, and unknown to it." [5] Yet, with the great adaptability of the early courts, this jurisdiction in the colonies was fitted into the judicial system so as to allow appeal, as in purely admiralty cases, to the High Court of Admiralty in England. *The Vrouw Dorothea* (1754) reported in *The Fabius*, 2 C. Robinson 246.[6]

The same conflict which took place in England between Coke as champion of the common law jurisdiction, and the admiralty courts also was carried on in the colonies. Cf. *Talbot* v. *The Three Brigs,* 1 Dall. 95. As a result there was, throughout the eighteenth century, marked confusion as to the proper jurisdiction of each in forfeiture cases. For example, in 1702, the Board of Trade asked the advice of the Attorney General as to whether all forfeitures in connection with colonial trading matters under the Navigation Act of 1696 were to be prosecuted exclusively in courts of admiralty, and the Attorney General replied in the affirmative.[7] On the other hand it is clear, as the cases

and having a governor and magistrates of their own choice, it was very difficult to enforce any regulations which came from the English parliament, and were adverse to their colonial interests." Reeves, The Law of Shipping, 56 (1807).

[5] 2 Brown, Civil and Admiralty Law, 2d ed., 491 (1802).

[6] For an account of the development of admiralty jurisdiction in the colonies, see 4 Andrews, The Colonial Period of American History, Chap. 8; Root, Relations of Pennsylvania with the British Government, 1696–1765, Chap. 4; the argument made by Daniel Webster as counsel in *United States* v. *Bevans,* 3 Wheat. 336, 379, *et seq.;* the Reporter's note to *United States* v. *Wiltberger,* 5 Wheat. 76, 113.

[7] 2 Chalmers, Opinions of Eminent Lawyers, 187 (1814); Andrews, *supra,* 169; Webster, *supra,* 3 Wheat. at 383.

cited by the Court show, that this view was not always maintained. One can only conclude that there was in 1789 no completely clear resolution of the conflict between admiralty and common law courts in forfeiture cases, though the cases hereafter considered indicate that the admiralty courts were winning the dominant role. At the same time it must be conceded by the proponents of the Court's view that American practice had come to be markedly different from the English.

It is settled beyond question that the general admiralty law of the United States in 1789 was the law as developed in the colonies and not the law as it came from England. Prior to the middle of the nineteenth century a contrary view was often pressed upon the Court and was as often rejected with adequate reference to the differences between the two.[8] The early American courts therefore were faced with the task of determining whether forfeiture actions should be brought exclusively in the common law courts, exclusively in the admiralty courts, or concurrently in either. In repeated decisions relating to forfeitures under federal laws, this Court, within a few years of the adoption of the Judiciary Act of 1789, held that forfeiture jurisdiction was exclusively in the admiralty courts.

The leading case for this proposition is *La Vengeance,* 3 Dall. 297 (1796). In that case the United States brought an action of forfeiture for exporting arms and ammunition. The United States contended in this Court that the action was criminal in its nature and that, in any case, it was not a civil suit within the admiralty and maritime jurisdiction and therefore should have been tried before a jury as at common law. The Court held that the action was clearly civil since it was an *in rem* proceeding and that

---

[8] See e. g. *Manro* v. *Almeida,* 10 Wheat. 473, 489; *Waring* v. *Clarke,* 5 How. 441, 454; *New Jersey Steam Navigation Co.* v. *Merchants' Bank,* 6 How. 344, 389; and see *The Genesee Chief,* 12 How. 443.

it was subject to the maritime jurisdiction because the basic transportation activity involved was "entirely a water transaction." There is no suggestion whatever, in the brief opinion of the Court, of the possibility of a concurrent common law jurisdiction. This rule was followed in *The Sally,* 2 Cranch 406, where the government again contended that it was entitled to try forfeiture actions before a jury since the "cause was of common law, and not of admiralty and maritime jurisdiction," and the same result was reached in *The Samuel,* 1 Wheat. 9.[9]

One of the most elaborate arguments ever made in this Court on the issue now before us was presented in 1808 in *United States* v. *Schooner Betsey and Charlotte,* 4 Cranch 443. That case arose on an action for forfeiture. Counsel for the claimant, who had also been the losing counsel in *La Vengeance,* contended that the action should have been tried as at common law. He strongly emphasized the Exchequer practice in England and said, "There is nothing in the course of proceedings *in rem* which requires that they should be in a court of admiralty." *Id.* 447. The argument he made was almost identical with that which the Court adopts in the instant case. He emphasized particularly that "We have seen that in all cases of seizure for breaches of the law of revenue, trade or navigation, the common law is competent to give a remedy; and consequently this suitor is entitled to it." *Id.* 449.

The Court rejected entirely the argument of the counsel, held *The Betsey and Charlotte* indistinguishable from *La Vengeance,* and interpreted the Judiciary Act to mean that Congress had placed forfeitures "among the civil causes of

---

[9] In *The Samuel,* the claimant contended that since the action was begun by an information rather than a libel, the case was not subject to the admiralty jurisdiction. The Court held that "Where the cause is of admiralty jurisdiction, and the proceeding is by information, the suit is not withdrawn, by the nature of the remedy, from the jurisdiction to which it otherwise belongs." p. 14.

admiralty and maritime jurisdiction." *La Vengeance* was held conclusive of the proposition that in such cases there could be no right to trial by jury—in other words that under the American law as repeatedly declared between 1796 and 1808, the common law was not, within the meaning of the Judiciary Act, competent to give a remedy in forfeiture cases.[10]  When the question of a right to a common law trial in a forfeiture case was certified to the Supreme Court in 1812, the Court found it unnecessary to hear any argument and counsel became so convinced that the authorities were conclusive that he did not press the case.[11]

These cases were reviewed many times in this Court and elsewhere, and cited for the proposition that in the United States, in noteworthy distinction from England, the admiralty forfeiture jurisdiction was exclusive.[12]  This cul-

---

[10] Justice Chase in the course of argument commented from the bench that he thought *La Vengeance* a well considered case.  His comment leaves no doubt that he considered the admiralty jurisdiction for forfeiture exclusive: "The reason of the legislature for putting seizures of this kind on the admiralty side of the court was the great danger to the revenue, if such cases should be left to the caprice of juries." p. 446.

[11] *Whelan* v. *United States,* 7 Cranch 112.

[12] "This Court decided, as early as 1805 (2 Cranch 405), in the case of the *Sally,* that the forfeiture of a vessel, under the Act of Congress against the slave-trade, was a case of admiralty and maritime jurisdiction, and not of common law.  And so it had done before, in the case of *La Vengeance.*"  *Waring* v. *Clarke,* 5 How. 441, 458.  "All the cases thus arising under the revenue and navigation laws were held to be civil causes of admiralty and maritime jurisdiction within the words of the Constitution, and, as such, were properly assigned to the District Court, in the Act of 1789, as part of its admiralty jurisdiction."  *New Jersey Steam Navigation Co.* v. *Merchants' Bank,* 6 How. 344, 389. And see to the same effect *The Margaret,* 9 Wheat. 421, 427; *The Sarah,* 8 Wheat. 391, 394; *The Belfast,* 7 Wall. 624, 638.  For acceptance of this view and a criticism of the result see the dissenting opinion in *Jackson* v. *The Magnolia,* 20 How. 296, 309.  It is worthy of note that this opinion by Mr. Justice Daniel makes an argument very similar to that now made by the Court and relies as does the

minated in a holding in 1868, *The Eagle,* 8 Wall. 15, 25, 26, that the words in the 1789 Act giving admiralty jurisdiction in forfeiture cases were superfluous and of no effect since "the general jurisdiction in admiralty exists without regard to it."

Against the background of these cases we may consider *Smith* v. *Maryland,* 18 How. 71, which the Court cites for the existence of the forfeiture exception to the general rule as to exclusive admiralty jurisdiction of *in rem* proceedings. In that case the power of the state to protect a fishery by making it unlawful to catch oysters in a certain manner and to inflict a penalty of forfeiture upon a vessel employed in violation of the law was upheld. The entire argument was directed at considerations foreign to the issue of this case and the Judiciary Act was not even mentioned; the opinion of the Court deals almost exclusively with the question of whether the state statute was in conflict with the commerce clause of the Constitution. The Court held in passing that the mere existence of federal admiralty jurisdiction does not *per se* bar the state from legislating for the protection of its fisheries, a proposition which no one can doubt. It is apparent that the issue now before us, interpretation of the Judiciary Act, was not presented to the Court nor decided by it in the *Smith* case. The Court in the instant case treats *Smith* v. *Maryland* as a holding for a proposition which can flow from it only by accident.

---

Court on a passage from Kent. The majority of the Court did not accept Daniel's position. Kent himself acknowledged that the view he held was not the law as declared in this Court but he felt that *La Vengeance* was not "sufficiently considered." 1 Kent's Commentaries, 12th ed., 376. In *De Lovio* v. *Boit,* Fed. Cas. No. 3,776, 2 Gallis. 398, 474, Justice Story sitting as a Circuit Judge said: "It has . . . been repeatedly and solemnly held by the Supreme Court, that all seizures under laws of impost, navigation and trade, . . . are causes of admiralty and maritime jurisdiction."

If *Smith* v. *Maryland* accidentally interpreted the Judiciary Act, it did so in a manner in conflict not only with all the cases decided before it in which the issue was squarely considered but with the great number of cases decided since. In *The Moses Taylor,* 4 Wall. 411, 431 (1866), our leading case, the Court declared that "a proceeding *in rem,* as used in the admiralty courts, is not a remedy afforded by the common law." The considerations of policy which underlay this interpretation of the Judiciary Act were attributed to Justice Story: " 'The admiralty jurisdiction,' says Mr. Justice Story, 'naturally connects itself, on the one hand, with our diplomatic relations and the duties to foreign nations and their subjects; and, on the other hand, with the great interests of navigation and commerce, foreign and domestic. There is, then, a peculiar wisdom in giving to the national government a jurisdiction of this sort which cannot be yielded, except for the general good, and which multiplies the securities for the public peace abroad, and gives to commerce and navigation the most encouraging support at home.' " *The Moses Taylor, supra,* 430–431.

The language of *The Moses Taylor* has been repeated so often that I should have thought it to be a truism of the law. In *The Belfast,* 7 Wall. 624, 644: "There is no form of action at common law which, when compared with the proceeding *in rem* in the admiralty, can be regarded as a concurrent remedy." In *Rounds* v. *Cloverport Foundry Co.,* 237 U. S. 303, 306: "The proceeding *in rem* . . . is within the exclusive jurisdiction of admiralty." In *Knapp, Stout & Co.* v. *McCaffrey,* 177 U. S. 638, 648: "The true distinction between such proceedings as are and such as are not invasions of the exclusive admiralty jurisdiction is this: If the cause of action be one cognizable in admiralty, *and* the suit be *in rem* against the thing itself . . . the proceeding is essentially one in admiralty."

In *Red Cross Line* v. *Atlantic Fruit Co.*, 264 U. S. 109, 124: "A State may not provide a remedy *in rem* for any cause of action within the admiralty jurisdiction." [13]

Cases prior to *Smith* v. *Maryland* explicitly held that forfeitures were not to be enforced by an *in rem* action at common law. Cases since *Smith* v. *Maryland* have repeatedly declared that admiralty's *in rem* jurisdiction is exclusive of state court action. I therefore see no reason for placing any reliance on the *Smith* case which only consequentially affected an issue to which it gave no consideration at all; and for purposes of settling a jurisdictional issue such as this, the English practice, which need give no consideration to the complexities of dual sovereignty and diverse state laws, seems peculiarly inapplicable. By permitting maritime suits against persons in state courts and by denying the state courts jurisdiction of suits against vessels, the right to trial by jury is adequately preserved at the same time that the policy of ultimate exclusive national regulation of ships in commerce is saved.

---

[13] Additional statements to the same effect are: *Hine* v. *Trevor*, 4 Wall. 555, 571; *Leon* v. *Galceran*, 11 Wall. 185, 188; *Steamboat Co.* v. *Chase*, 16 Wall. 522, 530; *The Lottawanna*, 20 Wall. 201, 218; *Edwards* v. *Elliott*, 21 Wall. 532, 556; *Norton* v. *Switzer*, 93 U. S. 355, 365; *Johnson* v. *Chicago & Pacific Elevator Co.*, 119 U. S. 388, 397; *The J. E. Rumbell*, 148 U. S. 1, 12; *Moran* v. *Sturges*, 154 U. S. 256, 276; *The Glide*, 167 U. S. 606, 615; *The Robert W. Parsons*, 191 U. S. 17, 37; *Chelentis* v. *Luckenbach S. S. Co.*, 247 U. S. 372, 383; *Panama R. Co.* v. *Vasquez*, 271 U. S. 557, 561.