**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**John V. SALAMONE, Appellant.**

Superior Court of Pennsylvania.

Argued Aug. 31, 2005.
Filed April 10, 2006.

---

Joseph P. Green, Jr., West Chester, for appellant.

James W. Saerk, Asst. Dist. Atty., Norristown, for Com., appellee.

BEFORE: KLEIN, PANELLA, and KELLY, JJ.

OPINION BY KELLY, J.:

¶ 1 Appellant, John V. Salamone, appeals from the judgment of sentence following his convictions for risking a catastrophe[1] and recklessly endangering another person,[2] and the order denying his motion for return of property and directing his forfeiture of $34,000 to the Commonwealth entered in the Montgomery County Court of Common Pleas.[3] We are asked to determine, *inter alia:* (1) whether the piloting of an airplane for four hours around a major urban international airport and surrounding populated areas under the influence of alcohol and valium constitutes the "means" required for causing potentially wide spread injury under the Pennsylvania Crimes Code statute for causing or risking a catastrophe; and (2) whether there exists common law authority in this Commonwealth to forfeit an airplane used in such action when the pilot is subsequently convicted of criminal charges. For the foregoing reasons, we resolve both issues in the affirmative.

¶ 2 For approximately four hours on January 15, 2004, Appellant piloted his single engine aircraft in Philadelphia, Montgomery, and Bucks Counties while *intoxicated.* He flew around Philadelphia International Airport, a restricted Class B airspace, without permission and unpredictably changed speeds, altitudes, and directions.[4] Two pilots preparing to land their freight plane saw a stray aircraft, Appellant's plane, coming toward them and quickly ascended. When they had risen 500 feet, Appellant's plane passed within 300 feet beneath them. Appellant came close to other planes, requiring air traffic controllers to redirect aircraft to different areas of the airport to avoid colliding with him. Airport traffic officials attempted numerous times, unsuccessfully, to contact Appellant, who finally responded when his fuel ran low. Meanwhile, the pilot of a Philadelphia Police Department helicopter dispatched to the airport hearing Appellant's voice over radio transmission, later described it as slurred, and at times unintelligible. (N.T. Trial, 9/14/04, at 30). Appellant then headed away, flying over Montgomery County, with the

---

1. 18 Pa.C.S.A. § 3302(b).

2. 18 Pa.C.S.A. § 2705.

3. We consolidate *sua sponte* the instant appeals for purposes of review. *See Commonwealth v. Galletta,* 864 A.2d 532, 533 n. 1 (Pa.Super.2004).

4. The airspaces around the nation's busiest airports are classified as Class B. Among other requirements, pilots must first obtain clearance from an air traffic controller to enter or exit a Class B airspace. The purpose of these restrictions is to ensure that all pilots in these airspaces communicate with air traffic controllers, and that controllers can separate aircraft from one another.

police helicopter following. Appellant continued to fly at erratic speeds, altitudes, rates of climb, and direction, and at one point suddenly made a steep descent from a high altitude. The officer later testified this maneuver generally occurs only where there is an emergency or aircraft malfunction. Nevertheless, Appellant continued flying.

¶ 3 Air traffic control advised Appellant to land at Northeast Philadelphia Airport because it was closer and could accommodate fire department services if necessary. Appellant refused to land there, indicating he wished to land at Wings Field Airport, in Montgomery County, instead. On the way there, however, Appellant changed direction and indicated he wished to land at Pottstown–Limerick Airport. During this time, Appellant continued to change altitudes and directions erratically. Appellant missed the runway on his first attempt to land, made an abrupt U-turn and flew directly toward the police helicopter, coming within 500 feet of it. Appellant then communicated to the officer that he could not find the airport. When the officer saw Appellant come within 1,000 feet horizontally and a few hundred feet vertically of the Pottstown–Limerick nuclear power plant cooling towers, he positioned his helicopter between Appellant and the towers and directed Appellant to follow it to land. Once Appellant safely landed his plane, he was taken into state police custody. A blood test revealed he had a blood alcohol level of 0.15% and the presence of valium.

¶ 4 Appellant's plane was confiscated because it was used in the commission of the crimes charged. In March of 2004, after Appellant filed a motion for the return of this property, the Commonwealth filed an answer and new matter requesting forfei-ture of the aircraft. The trial court postponed ruling on Appellant's motion for return of property pending resolution of the underlying criminal charges. Following a bench trial in September of 2004, Appellant was convicted of risking a catastrophe and recklessly endangering the welfare of another person, for which he was sentenced in November to six to twenty-three months' imprisonment and an aggregate five years' probation. Appellant filed a timely notice of appeal on December 29, 2004, challenging only his conviction for risking a catastrophe.

¶ 5 Meanwhile, in November of 2004, Appellant's airplane was sold for $34,000 under the parties' agreement that the proceeds of the sale would be treated as the *res* for purposes of litigation. After a hearing on Appellant's motion to return property, the trial court determined in January of 2005 that Appellant's plane constituted derivative contraband, and granted the Commonwealth's request for forfeiture in the amount of $34,000. Appellant appealed from this order also.[5]

¶ 6 Appellant presents the following issues for our review:

DID THE TRIAL COURT ERR IN CONCLUDING THAT THE EVIDENCE WAS SUFFICIENT TO CONVICT [APPELLANT] ON THE CHARGE OF RISKING CATASTROPHE, 18 PA.C.S. § 3302(B), WHERE THE COMMONWEALTH FAILED TO ESTABLISH BEYOND A REASONABLE DOUBT, THAT HE ENGAGED IN ANY CONDUCT THAT CONSTITUTED ANY "MEANS OF CAUSING **POTENTIALLY WIDESPREAD** INJURY OR DAMAGE?

---

5. On February 28, 2005, the Commonwealth filed an application to transfer the appeal from the forfeiture order from this Court to the Commonwealth Court. On March 17, 2005, the application was denied *per curiam* because of Appellant's related and pending appeal from the judgment of sentence.

(Appellant's Brief, No. 10 EDA 2005, at 5) (emphasis in original).

> DID THE TRIAL COURT ERR IN REFUSING TO RETURN THE APPELLANTS' PROPERTY, AND IN DIRECTING FORFEITURE, WHERE FORFEITURE WAS NOT AUTHORIZED, AND WHERE A $34,000 FORFEITURE WAS UNCONSTITUTIONALLY EXCESSIVE AND WHERE THE TRIAL COURT ABUSED WHATEVER DISCRETION IT MIGHT HAVE HAD?

(Appellant's Brief, No. 305 EDA 2005, at 4).

■ ¶ 7 In his first issue, Appellant claims the evidence was insufficient to sustain a conviction for risking a catastrophe. He contends a person cannot be convicted of risking a catastrophe unless he employs one of the statutorily prohibited means of causing or risking catastrophe, and that the act of flying an airplane is not such a means. Appellant also argues that his operation of a single engine aircraft could not cause widespread injury, and concludes his conviction on the charge of risking catastrophe must be reversed. We disagree.

> Our well-settled standard of review when evaluating a challenge to the sufficiency of the evidence mandates that we assess the evidence and all reasonable inferences drawn therefrom in the light most favorable to the verdict-winner, in this case the Commonwealth. If the fact-finder could have found that every element of the crime charged had been proven beyond a reasonable doubt, the evidence is *ipso facto* sufficient to sustain a conviction for that crime.

*Commonwealth v. Whitacre*, 878 A.2d 96, 99 (Pa.Super.2005) (citations omitted).

■ ¶ 8 Section 3302 of the Crimes Code provides in relevant part:

> § 3302. **Causing or risking catastrophe**

> (a) **Causing catastrophe.**—A person who causes a catastrophe by explosion, fire, flood, avalanche, collapse of building, release of poison gas, radioactive material or other harmful or destructive force or substance, or **by any other means** of causing potentially widespread injury or damage ... commits a felony of the first degree if he does so intentionally or knowingly, or a felony of the second degree if he does so recklessly.

> (b) **Risking catastrophe.**—A person is guilty of a felony of the third degree if he recklessly creates a risk of catastrophe in the employment of fire, explosives or other dangerous means listed in subsection (a) of this section.

18 Pa.C.S.A. § 3302 (emphasis added). This Court has distinguished the two sections of this statute:

> Section 3302 attempts to meet two separate and distinct societal harms. In paragraph (a) it purports to punish **for the damage caused** by the mishandling of certain enumerated highly dangerous forces or substances. Paragraph (b) addresses the **exposure to harm** created by the misuse of these forces or substances.

*Commonwealth v. Hughes*, 468 Pa. 502, 364 A.2d 306, 309 (1976) (emphasis in original) (footnotes omitted). Additionally, "[t]he fact that swift and effective governmental intervention limited the deleterious effect of [the defendants'] reckless conduct does not decriminalize their actions. The fact that an actual devastating catastrophe was averted is of no moment in assessing [the defendants'] conduct in terms of Section 3302(b)." *Commonwealth v. Scatena*, 508 Pa. 512, 498 A.2d 1314, 1317 (1985).

¶ 9 The Pennsylvania Supreme Court recently addressed the "other means" by which a person could cause a catastrophe under both Section 3302(a) and (b) in *Com-*

*monwealth v. Karetny*, 583 Pa. 514, 880 A.2d 505 (2005). In that case, the defendants leased a pier on the Delaware River in Philadelphia on which they operated an open-air nightclub and banquet hall. *Id.* at 507. In December of 1994, the defendants hired engineers to evaluate damage caused by the collapse of some portions of the pier. *Id.* The engineers recommended a comprehensive maintenance and repair plan for the entire pier, but the defendants merely repaired the collapsed portions. *Id.* Between October of 1995 and May of 2000, the defendants were aware of additional damage to the pier and its buildings, including cracks on the pier and in the floor of the banquet hall, separation of the banquet hall's ceiling, a bent gas pipe running along the side of the pier, and the twisting of steel reinforcements in the river. *Id.* at 507–09. Engineers repeatedly advised the defendants that the pier was moving and recommended continuous monitoring, but the defendants made only isolated repairs to the immediate and most visible damage. *Id.* at 509.

¶ 10 On a morning in May of 2000, one of the defendants called a marine construction consultant to evaluate old cracks in the pier which had increased in size. Moreover, new large cracks had appeared, and a plate in the seawall had moved more than six inches. *Id.* at 510. The consultant urgently warned that the pier would probably collapse that evening or the following morning. *Id.* Nevertheless, the defendant instructed employees to cover the cracks and opened the club for business that evening. *Id.* At approximately 8:00 p.m., the pier collapsed; the nightclub and part of the ballroom fell into the Delaware River, killing three people and injuring forty-three others. *Id.*

¶ 11 The defendants were charged with involuntary manslaughter, recklessly endangering another person, causing or risk-ing a catastrophe, failure to prevent a catastrophe,[6] and conspiracy. *Id.* at 511. However, the trial court quashed the charge of risking a catastrophe, finding the Commonwealth failed to present evidence of a particular **act** which would constitute a *prima facie* showing of that crime. *Id.* This Court affirmed the trial court's decision. *Id.* Upon review, the Pennsylvania Supreme Court reversed, rejecting the defendants' argument that the phrase "any other means" in Section 3302(a) should be circumscribed by the specific preceding language to include only inherently dangerous instrumentalities. *Id.* at 515–16. Instead, the Court held that under Section 3302(a) and (b):

> [T]he means by which the catastrophe is risked in a given case need not be specifically enumerated in the statute nor must they be *per se* dangerous in the absence of other factors. On the contrary, it is only required that the "means" in a given case have the **potential** to cause a catastrophe.

*Id.* at 517 (emphasis added). Accordingly, the Court held that the defendants' persistence in opening the club for business, their failure to warn or protect the public, and their affirmative attempts to conceal evidence of the pier's impending collapse fell under Section 3302's "any other means of causing potentially widespread injury or damage." *Id.*

¶ 12 Appellant's instant argument that piloting an aircraft is not a prohibited means under Section 3302 fails in light of *Karetny*. While flying an airplane, absent other factors, may not be *per se* dangerous, Appellant flew his plane while intoxicated for four hours in restricted airspace around a heavily trafficked, urban, restricted airport. Appellant initially did not respond to air traffic controllers' communications, and flew at unpredictable speeds,

---

6. 18 Pa.C.S.A. § 3303.

altitudes, and directions, in close proximity to other aircraft. In two instances, Appellant's plane flew head-on at other aircraft and came close to the cooling towers of a nuclear power plant. Contact between Appellant's aircraft and any of these could have caused widespread damage to the populated areas below, a nuclear power disaster, or injury or death to the other pilots and their passengers. Thus, we find that Appellant's intoxicated condition and reckless operation of his aircraft falls within the meaning of "other means of causing potentially wide-spread injury or damage." See 18 Pa.C.S.A. § 3302(a); Karetny, supra. Accordingly, the trial court correctly ·convicted Appellant of risking catastrophe. See id.; Whitacre, supra.

¶ 13 In his second issue, Appellant argues the trial court did not have authority to order the forfeiture of his plane or of the proceeds from the sale of the plane. He also avers the trial court lacked jurisdiction to consider forfeiture because he had already appealed his judgment of sentence. Appellant contends that even if the court were authorized to order forfeiture, $34,000 was excessive and grossly disproportionate to his crime. Appellant further argues the imposition of forfeiture is duplicative punishment and violates his constitutional right against double jeopardy. Appellant finally asserts that his right to a trial by jury on any factual allegation that would have increased the maximum available punishment was violated. Appellant concludes the trial court erred when it refused to grant his motion for return of property. We disagree.

¶ 14 Preliminarily, we note the well-established difference between types of contraband: "Contraband per se is something which [ ] is illegal to possess, such as heroin. Derivative contraband is defined as property which is not inherently illegal but which is used in the perpetration of an unlawful act." Common-wealth v. Crosby, 390 Pa.Super. 140, 568 A.2d 233, 236, (1990). Although possession of an airplane is not in itself criminal, Appellant's reckless and inebriated piloting of the airplane is intrinsic to his convictions of risking a catastrophe and recklessly endangering another person. In fact, he has not challenged the classification of his airplane as derivative contraband. Therefore, we are satisfied that the Commonwealth has provided a sufficient nexus between the airplane and Appellant's crimes to justify the characterization of the plane as derivative contraband. See Commonwealth v. One 1990 Dodge Ram Van, 751 A.2d 1235, 1236 (Pa.Cmwlth. 2000) (stating nexus existed between van and defendant's crimes when defendant stabbed victim in van and used it to discard body).

¶ 15 Our standard of review in assessing the propriety of a forfeiture order is limited to whether the trial court's findings of fact are supported by substantial evidence, and whether the trial court abused its discretion or committed an error of law. Commonwealth v. Real Property & Improvements, 574 Pa. 423, 832 A.2d 396, 398 (2003). "Forfeiture has been defined as 'the divestiture of property without compensation, in consequence of a default of an offense, and is a method deemed necessary by the legislature to restrain the commission of the offense and to aid in its prevention.'" Crosby, supra at 237 (emphasis in original) (quoting 36 Am.Jur.2d Forfeitures § 1).

¶ 16 We first address whether there is common law authority in the Commonwealth for forfeiture. This question was considered in Crosby, supra, in which this Court noted, "[S]ince forfeitures are not favored, ... they will not be given effect to, except by the express terms of a statute, and where the facts which purport to require such action come clearly

and plainly within the provisions of the law." *Crosby, supra* at 237 (emphasis in original) (quoting 37 C.J.S. *Forfeitures* § 5(a)). Until 1982, forfeiture cases in this Commonwealth involved only statutorily authorized forfeiture. *Crosby, supra* at 237. After 1982, however, there was "a series of opinions by the Superior Court" finding common law authority for the forfeiture of derivative contraband. *Id.* Nevertheless, those opinions ultimately relied on statutory authority.[7] *Id.* The *Crosby* Court then reasoned:

> While this brief review of the highlights of the law of forfeiture of derivative contraband suggests that there may be no convincing authority to support the conclusions ... that there can be "common law" forfeiture of derivative contraband in the absence of express statutory authority, we as a three-judge panel of this Court, are bound to follow these three precedents regardless of the soundness of their logical underpinnings, and particularly in the absence of any instruction from the Supreme Court on this issue.[ ]

*Id.* at 238.

¶ 17 In 1992, our Supreme Court addressed whether an owner of property subject to forfeiture under the Controlled Substances Forfeitures Act[8] was entitled to a jury trial under Article 1 of the Pennsylvania Constitution. *Commonwealth v. One (1) 1984 Z–28 Camaro Coupe*, 530 Pa.523, 610 A.2d 36, 37–38 (1992). After finding no statutory requirement for a jury trial, the Court considered whether there was a constitutional requirement by examining: (1) whether a jury trial was required in a forfeiture proceeding in 1790, the year the Pennsylvania Constitution was adopted; and if so, (2) "whether there is a common law basis for the proceeding." *Id.* at 39; *see Wertz v. Chapman Tp.*, 559 Pa. 630, 741 A.2d 1272, 1276 (1999). The Court held that the first proviso was satisfied. *One 1984 Camaro Coupe, supra* at 39 (citing *Wilcox v. Henry*, 1 Dall. 69, 1 U.S. 69, 1 L.Ed. 41 (Pa.1782)). As to the second proviso, the Court determined that forfeiture cases in English common law courts, such as the Court of Exchequer, were indeed heard by the court sitting with a jury.[9] *One 1984 Camaro Coupe, supra* at 40 (citing *C.J. Hendry Co. v. Moore*, 318 U.S. 133, 63 S.Ct. 499, 87 L.Ed. 663 (1943)). Although the jurisdiction of the Court of Exchequer was not established in the American colonies, "that jurisdiction was absorbed by the common law courts which entertained suits for the forfeiture of property under English or local statutes authorizing its condemnation." *One 1984 Camaro Coupe, supra* at 40 (quoting *C.J. Hendry Co., supra* at 139, 63 S.Ct. 499) (emphasis removed). Indeed, "[l]ong before the adoption of the Constitution the common law courts in the Colonies—and later in the states ...—

---

7. The *Crosby* Court cited the following cases as purporting to hold that there is common law authority for forfeiture but nevertheless relying on statutory authority in their reasoning: *Commonwealth v. Coghe*, 294 Pa.Super. 207, 439 A.2d 823 (1982) (citing to criminal statute providing for forfeiture of certain items in drug offenses); *Petition of Maglisco*, 341 Pa.Super. 525, 491 A.2d 1381 (1985) (relying on *Coghe* for common law forfeiture authority); *Estate of Peetros v. County Detectives*, 341 Pa.Super. 558, 492 A.2d 6 (1985) (citing to Pa.R.Crim.P. 324).

8. 42 Pa.C.S.A. §§ 6801–6802.

9. The Court explained the term "common law" in this context did not denote that the action originated at common law, "for even prior to 1790, forfeiture actions were of statutory origin." *One 1984 Camaro Coupe, supra* at 39; *see also Wertz, supra* at 1277. Rather, it defined the term "common law" as referring to those cases decided by the English common law courts, such as the Court of Exchequer, but not courts of Admiralty or Chancery. *One 1984 Camaro Coupe, supra* at 39.

were exercising jurisdiction *in rem* in the enforcement of forfeiture statutes." *One 1984 Camaro Coupe, supra* at 40 (quoting *C.J. Hendry Co., supra* at 139, 63 S.Ct. 499) (emphasis removed). Accordingly, the Court held that the forfeiture action, in which the owner claimed the seized goods were not contraband, had a common law basis. *One 1984 Camaro Coupe, supra* at 41; *see Wertz, supra* at 1277. Our Supreme Court's conclusion that forfeiture actions have a common law basis is reinforced by the Court's later reliance on the *Camaro Coupe* holding in *Wertz*, and our Court's reasoning in *Crosby*.[10] *See Wertz, supra* at 1277; *Crosby, supra* at 238. Thus, Appellant's instant claim that there is no common law authority for the forfeiture of the $34,000 fails.[11]

■ ¶ 18 Appellant's remaining claims, that the trial court lacked jurisdiction to consider forfeiture, that the forfeiture order constituted double jeopardy, and that the forfeiture of $34,000 was excessive, were not included in his court-ordered 1925(b) statement, in which the only reference to this forfeiture order stated in sum,

"This Honorable Court erred in refusing to grant the defendant's Motion For Return of Property, and the Claimant's Motion For Return of Property, prior to sentencing because there was no authority to retain the airplane and/or substitute proceeds after sentencing, and no authority to refuse the return of the airplane and/or substitute proceeds." (Appellant's 1925(b) Statement, filed January 12, 2005, at 1–2; R.R. at 62). Failure to raise an issue in a court-ordered 1925(b) statement results in waiver of that issue. Pa.R.A.P.1925(b); *Commonwealth v. Lord*, 553 Pa. 415, 719 A.2d 306, 309 (1998). Accordingly, these issues are waived.[12] *See* Pa.R.A.P.1925(b); *Lord, supra.*

¶ 19 Judgment of sentence affirmed. Order affirmed.

---

10. Like the cases described in *Crosby*, the Court held in *One 1984 Camaro Coupe* that forfeiture has a common law basis, even though forfeiture in that case was authorized by statute. *See id.* (considering forfeiture of automobile under Controlled Substances Forfeitures Act). Nevertheless, as this Court determined in *Crosby*, we are bound to apply the holding in *One 1984 Camaro Coupe* absent countervailing authority.

11. We note that our reasoning in this matter is consistent with that in the Commonwealth Court of Pennsylvania's recent affirming of a trial court's denial of the Commonwealth's petition to forfeit the defendant's vehicle under common law. *Commonwealth v. One 2001 Toyota Camry*, 894 A.2d 207, 208 (Pa. Cmwlth.2006) (*en banc*). The Commonwealth court noted its previous decision in *One 1990 Dodge Ram Van*, in which it acknowledged the doubts raised in *Crosby* and *Commonwealth v. Cox*, 161 Pa.Cmwlth. 589, 637 A.2d 757 (1994) as to the propriety of

common law forfeiture in Pennsylvania. *One 2001 Toyota Camry, supra* at 209–11. Nevertheless, the *One 1990 Dodge Ram Van* Court "relied on *Crosby* to hold that the van was derivative contraband subject to common law forfeiture because a specific nexus had been shown to exist between the van and the criminal activity." *One 2001 Toyota Camry, supra* at 210–11. The *One 2001 Toyota Camry* applied this reasoning to consider whether there was a sufficient nexus between the defendant's car and his crime of solicitation to commit murder when the defendant drove to two meetings with a "hitman" and conducted one of the meetings in his car. *Id.* at 211–13 (finding no sufficient nexus existed when vehicle used only as means of transportation and only some discussion occurred in vehicle, and Commonwealth failed to establish vehicle used as instrument of crime).

12. Our review of these issues concludes that even had they not been waived, they would not merit relief.