


FILED

Oct 31 2023, 10:27 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

I N   T H E

# Indiana Supreme Court

Supreme Court Case No. 23S-CR-72

## State of Indiana,

*Appellant (Plaintiff below)*

—v—

## $2,435 in United States Currency and Alucious Q. Kizer,

*Appellees (Defendants below).*

---

Argued: May 4, 2023 | Decided: October 31, 2023

Appeal from the Allen Circuit Court
No. 02C01-2109-MI-825
The Honorable Wendy W. Davis, Judge

On Petition to Transfer from the Indiana Court of Appeals
No. 22A-CR-578

---

**Opinion by Justice Goff**

Chief Justice Rush and Justices Massa, Slaughter, and Molter concur.

**Goff, Justice.**

The Indiana Constitution guarantees the same right to a jury trial in a civil case as existed at common law when the current constitution was adopted in 1851. The question here is whether this jury-trial right applies in an action seeking to confiscate money under Indiana's civil forfeiture statute. Our historical survey leads us to conclude that it does. We thus affirm the trial court and remand for trial by jury.

# Facts and Procedural History

Alucious Kizer fled from his car after police stopped him for a traffic violation. While running, Kizer discarded a veritable pharmacy of controlled substances—74 grams of methamphetamine, 67 grams of fentanyl, 12 grams of cocaine, 10 grams of crack cocaine, and 10 grams of synthetic cannabis. Officers also recovered a total of $2,435 in cash. The State later filed a complaint to forfeit the money, alleging that it had been "furnished or intended to be furnished" in exchange for a crime, that it had been "used to facilitate" a crime, or that it was "traceable as proceeds" of a crime. App. Vol. II, pp. 14–15. Kizer, *pro se*, denied the allegations and requested a jury trial. *Id.* at 24. The State, in turn, moved to strike Kizer's demand for a jury trial, arguing that no such right exists under either the state or federal constitution. *Id.* at 28–30. The trial court initially granted the State's motion but later vacated its order, concluding that the lack of guidance from Indiana's appellate courts warranted erring "on the side of awarding Defendants more rights and due process by honoring the right to jury trial in civil forfeiture cases, if timely requested." Order at 3. The State sought (and received) permission to bring an interlocutory appeal.

In a unanimous opinion, the Court of Appeals reversed, concluding that this Court "has long held" that a complaint for the "forfeiture of illegal property is 'not a civil case under the common law when the Constitution was adopted'" and, so, the "parties are not entitled to trial by jury." *State v. $2,435 in United States Currency*, 194 N.E.3d 1227, 1229 (Ind. Ct. App. 2022) (quoting *Campbell v. State*, 171 Ind. 702, 708–09, 87 N.E. 212, 214–15 (1909)). Rather, the panel reasoned, by "'denying individuals the

ability to profit from ill-gotten gain, an action for forfeiture resembles an equitable action for disgourgement or restitution.'" *Id.* (quoting *Caudill v. State*, 613 N.E.2d 433, 437 (Ind. Ct. App. 1993)).

Kizer, by counsel, petitioned for transfer, which we granted, thus vacating the Court of Appeals opinion. *See* Ind. Appellate Rule 58(A).

## Standard of Review

"Whether certain claims are entitled to a trial by jury presents a pure question of law" to which we apply a de novo standard of review. *Lucas v. U.S. Bank, N.A.*, 953 N.E.2d 457, 460 (Ind. 2011) (citing *Cunningham v. State*, 835 N.E.2d 1075, 1076 (Ind. Ct. App. 2005)).

## Discussion and Decision

Article 1, Section 20 of the Indiana Constitution ensures that in "all civil cases, the right of trial by jury shall remain inviolate." Ind. Const. art. 1, § 20. This fundamental guarantee secures the right to a jury trial "as it existed at **common law**" at the time Indiana adopted its current constitution. *Songer v. Civitas Bank*, 771 N.E.2d 61, 63 (Ind. 2002) (emphasis added) (citing *City of Crown Point v. Newcomer*, 204 Ind. 589, 595, 185 N.E. 440, 443 (1933)). For cases or claims deemed **equitable**, by contrast, "it is a well-settled tenet that a party is not entitled to a jury trial."[1] *Id. See also* Ind. Trial Rule 38(A). To resolve the question before us, we first ask

---

[1] The traditional distinction between law and equity derives from medieval England, where the Court of Chancery developed a distinct jurisprudence to meet the "inability—and to some extent the unwillingness—of the common-law courts to entertain and give relief in every case, and thus meet all the requirements of justice." 12 Ind. Law Encyc. Equity § 1 (2023). Indiana has since abolished the distinction "between actions at law and suits in equity." *Id.* § 2; *see also* Ind. Trial Rule 2 (prescribing a single "form of action"). Yet Indiana courts retain the power to apply equitable, as well as legal, rules "to administer justice according to fairness." *Doe v. Shults-Lewis Child & Fam. Servs, Inc.*, 718 N.E.2d 738, 747 (Ind. 1999).

whether the cause of action existed in 1851.[2] If so, then history settles the matter. *Gates v. City of Indianapolis*, 991 N.E.2d 592, 593 (Ind. Ct. App. 2013). But if the cause of action did not exist in 1851, we must decide whether the claim is analogous to one at law or one in equity, as those terms were then understood. *Id.* at 594.

The question here is whether a claimant in an action brought under Indiana's civil forfeiture statute has a constitutional right to trial by jury.[3] In defending this right, Kizer traces civil actions to forfeit property "used in violation of law" to the colonial common-law courts, which drew on the English *in rem* procedure with trial by jury. Pet. to Trans. at 12–14.

The State, for its part, argues that, because *in rem* civil forfeitures in Indiana are a purely statutory procedure of relatively modern vintage, Kizer has no right to a jury trial. Appellant's Br. at 9. While acknowledging that some types of forfeiture existed in 1851, the State insists that civil forfeiture actions like the one here—an action seeking forfeiture of funds illegally obtained from criminal activity or intended for future use in criminal activity—never existed at common law when Indiana adopted its current constitution. *Id.* at 9 & n. 1. And even if

---

[2] The date referred to in Trial Rule 38—June 18, 1852—is **not** the effective date of Indiana's current constitution, as some courts have concluded. *See, e.g., Hiatt v. Yergin*, 152 Ind. App. 497, 514, 284 N.E.2d 834, 843 (1972). The effective date of our constitution was November 1, 1851. *See* 1 Charles Kettleborough, Constitution Making in Indiana xcii (1916); *see also State ex rel. Weir v. Dawson*, 16 Ind. 40, 41 (1861) (referencing the 1851 date). The date referred to in Trial Rule 38 is the date on which the General Assembly, by constitutional mandate, enacted legislation designed to "abolish distinct forms of actions at law and to provide for the administration of justice in a uniform mode of pleading and practice, without distinction between law and equity." Act of June 18, 1852, 2 Ind. Rev. Stat. ch. 1; *see* Ind. Const. art. 7, § 20 (mandating this legislative revision) (repealed 1984). The confusion appears to stem from comments in the Civil Code Study Commission's draft of Rule 38. *See* Indiana Rules of Civil Procedure: Proposed Final Draft 162 (1968) (concluding that, "[u]nder Indiana law, as retained by [Trial Rule 38(A)], jury trial is limited to actions where the parties had the right of jury trial at common law prior to the adoption of the Constitution of Indiana in 1852"). While the difference in dates is unlikely to make a practical difference, we refer to 1851 as the operative year for our historical analysis.

[3] In resolving this case on state constitutional grounds, we need not address Kizer's claim that Hoosiers have a right to trial by jury in civil-forfeiture actions under the Seventh Amendment to the United States Constitution.

---

Indiana's forfeiture statutes reflect a "codification of previously existing law," the State contends that "there is still no right to a jury trial because the essential features of an *in rem* forfeiture action are equitable" rather than legal. *Id.* at 10.

In resolving this dispute, our opinion proceeds in two parts. In Part I, we clarify the proper framework for analyzing claims to a jury trial under Article 1, Section 20. Part II applies this framework to address the merits of Kizer's claim.

## I. The State's "special statutory procedure" theory takes an "unduly restrictive view" of Article 1, Section 20.

The State insists that Kizer has no right to a jury trial because "[*i*]*n rem* civil forfeitures pursuant to Indiana's drug forfeiture laws are a special statutory procedure" intended exclusively for trial by the court. Resp. in Opp. to Trans. at 13; Appellant's Br. at 9 (citing I.C. §§ 34-24-1-3, -4). Kizer disagrees, arguing that the State's theory would effectively deprive Hoosiers of a jury trial when filing suit under any modern statutory scheme. Pet. to Trans. at 16.

We agree with Kizer.

In *Midwest Security Life Insurance Co. v. Stroup*, the beneficiaries of a health-insurance plan sued the plan's administrator for breach of contract and bad faith and sought a jury trial. 730 N.E.2d 163, 165 (Ind. 2000). The administrator argued that the claims were preempted by ERISA (the federal Employee Retirement Income Security Act of 1974) and moved to strike the request for a jury trial. *Id.* The Court of Appeals agreed, holding that ERISA preempted the state-law claims and that, because ERISA embodied "a relatively recent statutory scheme" and "did not exist at common law," the plaintiffs "had no right to a jury trial to determine [their] benefits under the Plan." *Midwest Sec. Life Ins. v. Stroup*, 706 N.E.2d 201, 207 (Ind. Ct. App. 1999) (internal quotation marks and citation omitted), *vacated*. On transfer, this Court agreed with the Court of Appeals on the preemption issue but expressly declined to "address whether a jury trial would be allowed for

either the state law claims or for claims under ERISA." *Stroup*, 730 N.E.2d at 168–69.

In a concurring opinion, Justice Boehm wrote separately to address the plaintiffs' claim to a jury-trial right. The Court of Appeals' conclusion on that issue, he opined, took "an unduly restrictive view of Article I, Section 20." *Id.* at 169 (Boehm, J., concurring). Under such an approach, he emphasized, "parties filing suit under any statutory scheme that has been developed since 1852 would not be entitled to a jury trial because the cause of action did not exist at common law." *Id.* at 170. "The crucial inquiry" in his view was "not, as the Court of Appeals put it, whether a cause of action existed at common law" but, rather, "whether the cause of action is essentially legal or equitable, as those terms were used in 1852." *Id.* at 169.

Indiana courts have applied Justice Boehm's analytical framework in several cases. In *Cunningham v. State*, for example, the Court of Appeals considered whether the defendant was entitled to a jury trial for a traffic infraction. 835 N.E.2d 1075, 1076, 1077 (Ind. Ct. App. 2005). Given the absence of "1852 statutes governing speed zones," the court, using the "alternative path of analysis" urged by Justice Boehm in *Stroup*, determined "whether an action for a traffic infraction **would have been** considered equitable had it existed in 1852." *Id.* at 1078 (emphasis added). Because it "would not have been an equitable action," the court held that a jury right existed. *Id. See also Gates*, 991 N.E.2d at 595 (quoting *Cunningham*, 835 N.E.2d at 1078) (concluding "that the mandatory fines imposed in this case are akin to claims for money damages, which were 'exclusively legal actions in 1852'").

There are, to be sure, several (older) cases that support the State's theory. *See, e.g., State ex rel. Boeldt v. Crim. Ct. of Marion Cnty.*, 236 Ind. 290, 293, 139 N.E.2d 891, 893 (1957) (concluding that a proceeding for restoration of sanity is "a statutory proceeding, which is civil in nature, and it is not triable by a jury"); *State ex rel. Newkirk v. Sullivan Cir. Ct.*, 227 Ind. 633, 638, 88 N.E.2d 326, 328 (1949) (whether a party was entitled to a change of judge "is not triable by jury" as it involved "special statutory proceedings"); *Campbell*, 171 Ind. at 709, 87 N.E. at 215 (summarily concluding "that in statutory proceedings parties are not entitled to trial by jury as a constitutional right");

*Anderson v. Caldwell*, 91 Ind. 451, 454 (1883) (eminent-domain claim for assessing damages to land "is a special statutory proceeding, in which it is competent for the Legislature to dispense with a jury").

But Indiana precedent likewise cuts in the opposite direction. As this Court held in one late nineteenth-century case, a civil action, even as a "creature of positive statute," *is* "triable by a jury," so long it "did not come into existence as a suit of equitable cognizance." *Puterbaugh v. Puterbaugh*, 131 Ind. 288, 294–95, 30 N.E. 519, 521 (1892).[4] Indiana commentators have historically reached the same conclusion, emphasizing that the "fact that [certain common-law] actions have been codified does not alter their fundamental common-law character." 2 Bernard C. Gavit, Indiana Pleading and Practice § 318, at 2030 (1942). Were it otherwise, as other courts have opined, the legislature could "dispense with jury trials" altogether and "thus entirely defeat the provision of the Constitution." *People v. One 1941 Chevrolet Coupe*, 231 P.2d 832, 843 (Cal. 1951).[5]

We agree with this latter line of authority and now clarify the proper test for Article 1, Section 20's jury-trial right, adapting Justice Boehm's formula in *Stroup*: Parties in a civil case have a right to trial by jury in a cause of action (1) that was triable by jury at the adoption of the current constitution in 1851; or (2) if no such cause existed at the time, one that is essentially legal, rather than equitable, as those terms were understood in 1851,

---

[4] At issue in *Puterbaugh* was a statutory action to quiet title and to recover possession, which the Court deemed "substantially the same as the common-law action of ejectment." 131 Ind. at 295, 30 N.E. at 521.

[5] *See also State v. Items of Real Prop. Owned &/or Possessed by Chilinski*, 383 P.3d 236, 244 (Mont. 2016) ("The contention that a statutory provision, because it was enacted after ratification of the Montana Constitution in 1972, precludes the right of a jury trial from attaching to the statute's provisions, places too narrow an interpretation upon the issue."); *State v. One 1990 Honda Accord & Four Hundred Twenty Dollars*, 712 A.2d 1148, 1150 (N.J. 1998) ("Although forfeiture depends on a statute for its existence, it remains subject to common-law principles."). *Cf. United States v. One 1976 Mercedes Benz 280S*, 618 F.2d 453, 458 n. 17 (7th Cir. 1980) (quoting *Rogers v. Loether*, 567 F.2d 1110, 1115–17 (7th Cir. 1972)) (stressing "the distinction between a 'statutory proceeding' and a statutory right enforceable by a proceeding 'in the nature of' a suit at common law").

considering "the complaint, the rights and interests involved, and the relief demanded." *Stroup*, 730 N.E.2d at 170 (Boehm, J., concurring) (cleaned up).

## II. Article 1, Section 20 of the Indiana Constitution protects the right to a jury trial for *in rem* civil forfeitures.

In applying the analytical framework set forth above, we conclude that Article 1, Section 20 of the Indiana Constitution protects the right to a jury trial for *in rem* civil forfeitures. As explained below, the historical record—consisting of statutes and judicial decisions reflecting contemporary practice—strongly suggests that Indiana continued the common-law tradition of trial by jury in actions for the forfeiture of property. *See* Pt. II.A. We acknowledge, however, that the *in rem* procedure was infrequently used in Indiana during the first half of the nineteenth century and that the evidence on which we rely is largely circumstantial. We proceed, then, to the question of whether the forfeiture here is analogous to an action at law or to an equitable claim. *See* Pt. II.B. From this line of inquiry, we have little trouble concluding that the forfeiture here is not, as the State contends, akin to the equitable disgorgement of illegally obtained profits.

### A. The historical record strongly suggests that Indiana continued the common-law tradition of trial by jury in actions for *in rem* forfeiture of property.

We begin by examining the origins of civil forfeiture in England and colonial America. We then trace this history through the laws of the early United States, the Northwest and Indiana Territorial periods, and early statehood.

#### 1. England and Colonial America

Historically, England recognized three types of forfeiture: deodand, attainder forfeiture, and statutory forfeiture. At common law, proceeds from

the sale of an instrument responsible for causing a person's death—a knife, club, or some other inanimate object—vested in the Crown as deodand, whether for charitable purposes or as a source of revenue. *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 680–81 (1974). Despite its long-standing use in England, "[d]eodands did not become part of the common-law tradition of this country." *Id.* at 681 n. 19, 682.

Under attainder forfeiture, the Crown proceeded against the property owner *in personam.* Donald J. Boudreaux & A.C. Pritchard, *Innocence Lost: Bennis v. Michigan and the Forfeiture Tradition*, 61 Mo. L. Rev. 593, 602 (1996). Persons convicted of a felony forfeited their personal property to the Crown, whereas persons convicted of treason forfeited both their personal and real property. *Calero-Toledo*, 416 U.S. at 682. Conviction likewise resulted in "corruption of blood," effectively disqualifying the criminal offender from passing property to his heirs upon death. Boudreaux & Pritchard, *supra*, at 602–03 n. 68. Attainder forfeiture took root in some American colonial jurisdictions, Pennsylvania and Virginia among them. James R. Maxeiner, Note, *Bane of American Forfeiture Law—Banished at Last?*, 62 Cornell L. Rev. 768, 776–77 (1977). The practice likewise found its way into the Northwest Territory during the late eighteenth century. *See* Act of Sept. 6, 1788, in *The Laws of the Northwest Territory, 1788–1800*, at 13 (Theodore Calvin Pease ed., 1925) (deeming persons found to have committed treason to have "forfeit[ed] all his, her or their estate, real and personal, to this territory"). But, given its harsh consequences, attainder forfeiture quickly fell into disrepute in America. Maxeiner, *supra*, at 774.[6]

---

[6] The Framers of the United States Constitution expressly prohibited "Attainder of Treason" from resulting in "Corruption of Blood, or Forfeiture except during the Life of the Person attainted." U.S. Const. art. III, § 3, cl. 2. Most states followed suit, either curtailing attainder forfeiture or abolishing it altogether. Donald J. Boudreaux & A.C. Pritchard, *Innocence Lost: Bennis v. Michigan and the Forfeiture Tradition*, 61 Mo. L. Rev. 593, 604–05 (1996). Indiana fell into the latter category. Under both state constitutions, "no conviction shall work corruption of blood, nor forfeiture of estate." Ind. Const. art. 1, § 18 (1816); Ind. Const. art. 1, § 30 (1851) (virtually the same). *See also Ballard v. Bd. of Trs. of Police Pension Fund of City of Evansville*, 263 Ind. 79, 85–86, 324 N.E.2d 813, 817 (1975) (discussing the history of attainder forfeiture).

English law also imposed "statutory forfeitures of offending objects used in violation of the customs and revenue laws." *Calero-Toledo*, 416 U.S. at 682. The Navigation Acts of 1660, the most prominent example of this forfeiture type, mandated the use of English vessels for transporting goods to and from the American colonies. 12 Car. II, c. 18, § 1 (Eng.). Those ships found in violation of the law were subject to "Forfeiture and Losse of all the Goods and Commodityes" they contained, along with the vessel itself and "all its Guns Furniture Tackle Ammunition and Apparell." *Id.*

The Navigation Acts and other forfeiture statutes vested jurisdiction "in any Court of Record." *Id.* §§ 1, 3, 6, 18; *see C.J. Hendry Co. v. Moore*, 318 U.S. 133, 138 & n. 3 (1943) (citing statutes). The primary forum of enforcement in England was the Court of Exchequer. Caleb Nelson, *The Constitutionality of Civil Forfeiture*, 125 Yale L.J. 2446, 2460 (2016). Forfeiture suits in the Exchequer, filed by a Crown attorney or by an individual suing *qui tam* (or on behalf of the Crown), proceeded by "civil information,"[7] either *in personam* or *in rem*—the latter proceeding naming the property itself as the guilty party (with no need for a separate prosecution of the property owner). Maxeiner, *supra*, at 775, 782. In either case, a jury often tried the accused. Nelson, *supra*, at 2464.

Forfeiture suits in colonial America likewise proceeded by civil information *in rem*. Proceedings to enforce the Navigation Acts took place in the common-law courts, which "'closely followed the procedure in Exchequer,'" complete with trial by jury. *Id.* at 2462 (quoting *C.J. Hendry*, 318 U.S. at 139–40 & n. 4). By the late seventeenth century, however, Parliament—prompted by "'the obstinate resistance of American juries'"—had vested concurrent jurisdiction over colonial forfeiture proceedings in the vice-admiralty courts, which conducted proceedings **without a jury**. *Id.*

---

[7] While a modern "information" denotes a charging instrument in a criminal proceeding, the English Court of Exchequer used that term to describe the document filed in a civil *in rem* proceeding. Caleb Nelson, *The Constitutionality of Civil Forfeiture*, 125 Yale L.J. 2446, 2460–61 (2016); *see also* Joseph Chitty, Jr., *A Treatise on the Law of the Prerogatives of the Crown* 332 (London, Butterworth & Son 1820) (noting that the process of information in the Exchequer "is wholly different from the criminal proceeding by information in the King's Bench" and "is in the nature of a civil action at the suit of the Crown").

(quoting *C.J. Hendry*, 318 U.S. at 141). These courts, in the decades leading to the American Revolution, would become the primary forum for litigating forfeiture suits involving any "'act or acts of parliament relating to the trade and revenues'" of the colonies. *Id.* at 2463 (quoting the Revenue Act of 1764). The jurisdictional expansion of the vice-admiralty courts into cases that had little to do with maritime commerce would ultimately inspire the colonists—in their 1776 Declaration of Independence—to bitterly denounced the King and Parliament for depriving them "'in many cases of the Benefits of trial by Jury'" while imposing no such restrictions in the Exchequer courts of England. Matthew P. Harrington, *The Economic Origins of the Seventh Amendment*, 87 Iowa L. Rev. 145, 166–67 (2001) (quoting the Declaration of Independence para. 19).

### 2. Early United States

With independence from England, the new states continued to rely on statutory forfeiture (and *in rem* proceedings) as an effective tool of law enforcement and revenue generation. Nelson, *supra*, at 2468. And, with adoption of the U.S. Constitution in 1788, the federal government followed suit, enacting statutes that authorized the seizure and forfeiture of property connected with (among other things) piracy, arms exports, slave trading, alcohol distilling, sugar and snuff refining, tax evasion, trading with native peoples, and the violation of neutrality laws. Kevin Arlyck, *The Founders' Forfeiture*, 119 Colum. L. Rev. 1449, 1465 (2019) (citing statutes); Rufus Waples, *A Treatise on Proceedings In Rem* vi (Chicago, Callaghan & Co. 1882).

Enforcement of these (and other) statutes proceeded under the Judiciary Act of 1789, which vested exclusive jurisdiction in the federal district courts over "all seizures under laws of impost, navigation or trade of the United States" and "all suits for penalties and forfeitures incurred, under the laws of the United States." Act of Sept. 24, 1789, ch. 20, § 9, 1 Stat. 73, 77. To initiate a suit, the district attorney (sometimes at the behest of a *qui tam* informer or customs collector) would file a complaint in the name of the United States, referred to as a "libel" or an "information" *in rem*, setting forth a short and plain statement of the alleged violation and the articles intended for condemnation. Arlyck, *supra*, at 1469–70. The presence of a jury

depended on the type of forfeiture sought: When presented with claims involving vessels or cargo seized on navigable waters, the district courts sat as courts of admiralty, **without** the assistance of a jury.[8] *See United States v. La Vengeance*, 3 U.S. (3 Dall.) 297, 301 (1796). When presented with claims involving property seized on land, by contrast, the district courts sat as courts of common law **with** the assistance of a jury. *The Sarah*, 21 U.S. (8 Wheat.) 391, 394 (1823).

The decision in *Sundry Goods, Wares and Merchandises v. United States* offers an illustrative example of a forfeiture claim involving goods seized on land. In that case, the government filed a "libel or information" *in rem* in the United States District Court for the District of Indiana "against sundry goods and merchandise," seeking the forfeiture of certain "ardent spirits" carried unlawfully by a licensed trader "into the Indian country, lying on the north or west side of the Tippecanoe river." 27 U.S. (2 Pet.) 358, 362–63 (1829);[9] *see* Act of May 6, 1822, ch. 58, § 2, 3 Stat. 682, 682–83. The case was tried by jury and resulted in a verdict in favor of the government. 27 U.S. (2 Pet.) at 363. On review, the United States Supreme Court upheld the district court's instruction to the jury that **all** goods and merchandise intended for sale—whether "mingled with" or kept separate from the contraband—were liable to forfeiture. *Id.* at 366–67. But because those instructions contained ambiguities on where the goods may have been lawfully seized (within the Indian country or within U.S. jurisdiction), the Court remanded for a retrial, "with instruction to award a venire de novo"—a writ, that is, calling for a

---

[8] Under the Judiciary Act of 1789, issues of fact were tried by a jury "in all causes except civil causes of admiralty and maritime jurisdiction." Act of Sept. 24, 1789, ch. 20, § 9, 1 Stat. 73, 77. According to one scholar, the framers of the Judiciary Act "seemed to have forgotten most of the [colonial-era] rhetoric about the evils of trying trade cases in admiralty" without the benefit of a jury. Matthew P. Harrington, *The Legacy of the Colonial Vice-Admiralty Courts (Part II)*, 27 J. Mar. L. & Com. 323, 349 (1996). But, as Justice Samuel Chase explained, the "reason of the legislature for putting seizures of this kind on the admiralty side of the court was the great danger to the revenue if such cases should be left to the caprice of juries." *United States v. The Betsey & Charlotte*, 8 U.S. (4 Cranch) 443, 446 n. (1808) (Chase, J.). On the omission of "equity" from the Judiciary Act of 1789, see *One 1976 Mercedes Benz 280S*, 618 F.2d at 460 n. 30.

[9] The syllabus to the Court's opinion initially refers to the United States District Court for the District of Ohio. 27 U.S. (2 Pet.) at 358. It's unclear whether this was a scrivener's error or whether it was a consolidated case.

new jury panel to be summoned. *Id.* at 369; *see Venire Facias*, Black's Law Dictionary (11th ed. 2019).

From this brief history, we gather that "the common law as received in this country at the time of the adoption of the [federal] Constitution gave a remedy *in rem* in cases of forfeiture." *C.J. Hendry*, 318 U.S. at 153. And both English and American practice before and after 1791 "recognized jury trial of *in rem* actions at common law as the established mode of determining the propriety of statutory forfeitures on land for breach of statutory prohibitions." *One 1976 Mercedes Benz 280S*, 618 F.2d at 466.

The question we turn to now is whether Indiana practice recognized the same right to a jury trial of *in rem* actions at common law in 1851.[10]

### 3.　　Indiana

As with their counterparts along the eastern seaboard, the Northwest and Indiana Territorial governments passed several statutes governing the forfeiture of property. For example, a law enacted in 1790 (akin to the federal statute at issue in *Sundry Goods*) prohibited certain persons from trading any "articles of commerce" with the native tribes. Act of July 19, 1790, § 2, in *Laws of the Northwest Territory, 1788–1800*, at 27. Persons found to have engaged in unlawful trade were to "forfeit to the use of th[e] territory, all his or her goods and chattels personal." *Id.* A similar law,

---

[10] In theory, we could trace Indiana's jury-trial right back to the Northwest Ordinance of 1787, which (following its readoption by Congress in 1789) subjected the territory to the federal Judiciary Act of 1789. The Ordinance guaranteed to the territorial inhabitants the "benefits" of trial by jury "and of judicial proceedings according to the course of the common law." Act of Aug. 7, 1789, ch. 8, 1 Stat. 50, art. II (readopting Ordinance of July 13, 1787), *reprinted in* 1 U.S.C. LVII (2018). That charting document likewise subjected the territory to "all the acts and ordinances of the United States in Congress assembled." *Id.* at art. IV. When Indiana joined the Union in 1816, the right to trial by jury under the state's new constitution was a "pre-existing right" from the territorial period, *i.e.,* as it existed under the Northwest Ordinance, "according to the course of the common law." *Reynolds v. State ex rel. Titus*, 61 Ind. 392, 407 (1878). And when Indiana adopted the Constitution of 1851, the jury-trial right "continue[d] as it was" under the 1816 constitution. *Id.* at 408 (citation and quotation marks omitted). In practice, however, the states differed in their approach to forfeitures. *See* Maxeiner, *supra*, at 776; Nelson, *supra*, at 2472–75. So, we proceed with an analysis of Indiana's historical record.

enacted in 1799, prohibited any person from selling, bartering, or offering liquor in any "town or settlement of Indians within the territory" under pain of "forfeit[ing] the same." Act of Dec. 6, 1799, § 2, in *id.* at 415–16. Under an act to suppress gaming, any person found to have held a lottery or raffle for purposes of raising money or other property was to "forfeit to the use of the Territory the whole sum of money or property proposed to be so raised or gained." Act of July 16, 1795, § VI, in *id.* at 276, 277; *see also* Act of Sept. 17, 1807, §§ 7, 16, in *The Laws of Indiana Territory, 1801–1809*, at 371, 375 (Francis S. Philbrick ed., 1930) (same). And, by a statute of 1805, any person who failed to properly register a slave within the Territory would "forfeit all claim and right whatever, to the service and labour" of the slave. Act of Aug. 26, 1805, § 4, in *Laws of Indiana Territory, 1801–1809*, at 137.

In the decades following the transition to statehood, Indiana lawmakers expanded on the territorial forfeiture laws. In 1838, for example, the General Assembly enacted a measure "for the protection of Canals belonging to the State" and "the collection of tolls thereon." Act of Feb. 19, 1838, ch. 17, 1838 Ind. Acts 124.[11] This law imposed exhaustive regulations on the material construction and naming of boats, the speed at which they travelled, the navigation of canal locks, and the maintenance and presentation of documentation (*e.g.*, certificates of registration and clearance and bills of lading). *Id.* §§ 8–21, 31–37, 1838 Ind. Acts at 126–30. For every violation of these regulations, the statute imposed a penalty or forfeiture "for which any master, owner, boatman or other person may be

---

[11] Just two years before this statute, Indiana lawmakers passed the Internal Improvement Act, which called for the construction of canals, turnpikes, and railroads within the state. *N. Indiana Bank & Tr. Co. v. State Bd. of Fin. of Indiana*, 457 N.E.2d 527, 529 (Ind. 1983). With approximately $13 million in appropriations, the measure—designed to stimulate Indiana's sluggish economy—was a mammoth investment in the state's infrastructure. Justin E. Walsh, *The Centennial History of the Indiana General Assembly, 1816–1978*, at 31–32 (1987). But with appropriations far exceeding the state's average annual revenues (which hovered around $75,000), the project was also a huge economic risk. *Id.* at 33. And within a year the state lost millions, prompting concerns over bankruptcy. *Id.* The 1838 Act was likely intended (at least in part) as a means to recoup some of the state's financial losses.

liable." *Id.* §§ 22, 23, 33, 37–39, 1838 Ind. Acts at 128, 130.[12] In suits initiated "for any such forfeiture," the statute—using language reminiscent of the English Navigation Acts of 1660—expressly permitted the seizure and attachment of the boat, "together [with] the horses and furniture belonging thereto." *Id.* § 23, 1838 Ind. Acts at 128 (brackets in original); *see* 12 Car. II, c. 18, § 1 (subjecting to forfeiture the offending vessel and its "Guns Furniture Tackle Ammunition and Apparell"). And a writ of attachment could be issued against the boat itself in an *in rem* proceeding. *Cf. The Steam-Boat Tom Bowling v. Hough*, 5 Blackf. 188, 188, 189 (1839) (action against an indebted boat rather than a "guilty" boat).

In 1849, state lawmakers adopted legislation authorizing town trustees to prohibit or regulate gaming, spirituous liquors, slaughterhouses, firearms, horse racing, and stray animals, among other things. Act of Jan. 17, 1849, ch. 143, § 8, 1849 Ind. Acts 211, 212–14 (legislating powers for the Town of Laporte). To enforce these regulations, the law permitted town officials to summarily "abate and remove" those things deemed public "nuisances." *Id.* § 8, 1849 Ind. Acts at 214. Other sections allowed town officials to sue for the forfeiture of goods or chattels. To "restrain, regulate, or prohibit the running at large of horses" and other livestock, for example, the statute authorized the "distraining, impounding, and sale of the same for the penalty incurred and costs of proceedings."[13] *Id.* § 8, 1849 Ind. Acts at 213. Forfeitures of this type were generally enforced through *in rem* proceedings. *See Am. Furniture Co. v. Town of Batesville*, 139 Ind. 77, 78, 38 N.E. 408, 408 (1894) (describing the abatement of nuisances as a "proceeding *in rem*, and not *in personam*");

---

[12] The law also called for certain criminal penalties—including fines and imprisonment—for intentional damage to or interference with canal operations. Act of Feb. 19, 1838, ch. 17, §§ 1–6, 1838 Ind. Acts at 124–25.

[13] By authorizing local officials to impose forfeiture penalties, the General Assembly followed the common-law rule that "no municipal corporation could, without express authority, conferred by Parliament, enforce its by-laws . . . by forfeiture of goods." Christopher Tiedeman, *A Treatise on the Law of Municipal Corporations* § 154, at 271 (New York, Banks & Bros. 1894); *see also* James Grant, *A Practical Treatise on the Law of Corporations in General* 85 (London, Butterworths 1850) (forfeitures "levied by distress and sale of goods" required an act of parliament). Absent "such statutory authority municipal corporations are at common law limited to the imposition of pecuniary penalties or fines." Tiedeman, *supra*, § 154, at 271.

*McKee v. McKee*, 47 Ky. 433, 434 (1848) (describing the forfeiture of animals at large as "virtually a proceeding *in rem*"); *see also* Act of June 16, 1852, ch. 36, 1852 Ind. Acts 276 (describing procedures for the forfeiture and sale of "estray" property).

Beyond these statutes, Indiana law imposed monetary "forfeitures" (which we would today call fines) for certain violations, either for a specific sum or for an amount proportioned to the value of the goods involved. Legislation enacted in 1825, for example, subjected persons unlicensed to practice law to forfeiture of "three-fold the amount or value" of money or "other species of property" received for services rendered. Act of Jan. 31, 1825, ch. 8, § 9, 1825 Ind. Acts 83, 85.[14]

As with traditional Exchequer procedure, these legislative acts authorized the proper official (whether the prosecutor or the customs collector) to recover forfeitures in "any court of record" or "in any court of competent jurisdiction." *See* Act of Jan. 31, 1825, ch. 8, § 9, 1825 Ind. Acts at 85; Act of Feb. 19, 1838, ch. 17, § 50, 1838 Ind. Acts at 132. Likewise consistent with English practice was the statutory recognition of a right to trial by jury. *See, e.g.*, Act of Jan. 17, 1849, ch. 143, § 11, 1849 Ind. Acts at 215 (expressly recognizing the use of juries in any forfeiture "action or proceeding in which the said town is a party"); *see also* James Grant, *A Practical Treatise on the Law of Corporations in General* 85 (London, Butterworths 1850) (recognizing that "no man is to be dispossessed of his property" by forfeiture "but *per legale judicium parium suorum*," or by the legal judgment of his peers); John F. Dillon, *Treatise on the Law of Municipal Corporations* § 282, at 295–96 (Chicago, Cockcroft & Co. 1872) (citing caselaw for the same proposition).

Rather than direct the government to file an information or libel *in rem* against the goods themselves, many (if not most) early nineteenth-century statutes in Indiana authorized the designated official to recover forfeitures

---

[14] The Indiana Territorial government imposed similar monetary penalties or "forfeitures." *See, e.g.*, Act of Dec. 5, 1806, § 1, in *The Laws of Indiana Territory, 1801–1809*, at 210 (Francis S. Philbrick ed., 1930) (subjecting persons found to have misbranded another person's cattle to forfeiture of five dollars "over and above the value of such" cattle).

by "action of debt" against the offending party directly, "in the name of the state of Indiana." *See, e.g.*, Act of Feb. 19, 1838, ch. 17, § 50, 1838 Ind. Acts at 132. A procedure long used in England's Court of Exchequer, an action of debt, like the information *in rem*, was a civil action for recovering fines and forfeitures under the "penal" statutes. Nelson, *supra*, at 2498; *see also Davis v. State ex rel. Long*, 119 Ind. 555, 556, 22 N.E. 9, 9 (1889).[15] Because of their civil, remedial nature, forfeitures by action of debt differed little "in purpose and effect [from] the *in rem* forfeitures of the goods to whose value they were proportioned." *United States v. Bajakajian*, 524 U.S. 321, 342–43 & n. 18 (1998).

This practice, of course, departed from the personification fiction of the "guilty" *res*. But the option of proceeding *in personam* by action of debt did **not** preclude the state from recovering forfeitures through the *in rem* procedure. To the contrary, many Indiana statutes offered prosecutors a choice of procedures. During the territorial period, for example, the government might recover "by action of debt **or information**" in "any court of record." *See, e.g.*, Act of Sept. 4, 1803, § 24, in *Laws of Indiana Territory, 1801–1809*, at 60 (emphasis added); Act of Nov. 29, 1806, § 1, in *id.* at 190 (same).[16] And, when presented with statutes reflecting these enforcement options, courts understood the word "information" to broadly encompass "proceedings *in rem*, for forfeitures." *The Bolina*, 3 F. Cas. 811, 812 (Story, Circuit Justice, C.C.D. Mass. 1812).

Statutes enacted during the first decades of statehood offered government lawyers similarly broad discretion in the method of enforcement. Officials could recover "any penalty or forfeiture" by "action of debt **or any other form of action**, in any court of competent jurisdiction." Act of Jan. 17, 1849,

---

[15] In England, an action of debt was a proper means of collecting a "forfeiture" due under "all penal statutes, that is, such acts of parliament whereby a forfeiture is inflicted for transgressing the provisions therein enacted." 3 William Blackstone, Commentaries on the Laws of England 159 (London, John Murray 1857). Given the "implied original contract to submit to the rules of the community," Blackstone explained, a forfeiture was deemed to have "immediately create[d] a debt in the eye of the law." *Id.*

[16] Published forms during this period embodied this flexibility in enforcement procedure. *See, e.g.*, Act of Sept. 9, 1814, in *The Laws of Indiana Territory, 1809–1816*, at 550 (Louis Ewbank & Dorothy Riker eds., 1934) (form for action of debt "or as the case may be").

ch. 143, §§ 8, 10, 1849 Ind. Acts 211, 214, 215 (emphasis added); *see also, e.g.*, Act of Jan. 31, 1843, ch. 156, § 3, 1843 Ind. Acts 146, 146–47 (using similar language). To be sure, *in rem* proceedings are largely absent from early-nineteenth-century published case reports in Indiana.[17] But the option to proceed *in personam* (by action of debt) did "not prevent the [government] from pursuing such other remedies as [it] might have had by reason of the forfeiture," including an *in rem* proceeding. *United States v. Grundy & Thornburgh*, 7 U.S. (3 Cranch) 337, 346, 348 (1806). Indeed, when seeking to forfeit property used "for an unlawful purpose," the prosecutor enjoyed the "ancient prerogative," to "proceed not only against the individual responsible" but also "against the thing itself" when "the public is interested." *Steward v. State*, 180 Ind. 397, 408, 103 N.E. 316, 320 (1913).

While the *in rem* procedure had long been available to Indiana lawyers, *see, e.g.*, *The Steam-Boat Rover v. Stiles*, 5 Blackf. 483, 483 (Ind. 1840), the practice assumed a more prominent role by mid-century with the state's effort to criminalize certain forms of property that had traditionally enjoyed some degree of legal protection. In 1855, the General Assembly enacted a law prohibiting the manufacture and sale of spirituous and intoxicating liquors. Act of Feb. 16, 1855, ch. 105, 1855 Ind. Acts 209. With exceptions for alcohol used for "sacramental" or "medicinal" purposes, the Act specified that all liquors "sold in violation of the law, and the vessels containing the same, shall be deemed a nuisance, and shall be forfeited and be disposed of" in accordance with specific procedures. *Id.* § 2, 5, 14, 1855 Ind. Acts at 211,

---

[17] An exception involved actions against things indebted. Under an 1838 statute, for example, all "boats and vessels" in the state were "liable for all debts contracted" for construction and repair. Act of Feb. 17, 1838, ch. 14, § 1, 1838 Ind. Acts 120, 120. The statute permitted any claimant with a lien against the vessel to request from a court a warrant "authorizing and directing the seizure and detention of the same." *Id.* § 2, 1838 Ind. Acts at 121. And these liens were enforceable as an "action *in rem*" against the vessel itself "in the Courts of common law." *The Steam-Boat Rover v. Stiles*, 5 Blackf. 483, 483, 484 (Ind. 1840).

215.[18] The Act also called for the issuance of a notice "to all persons concerned," a copy of which was to be posted "in some conspicuous place on the premises where the liquor was seized." *Id.* § 16, 1855 Ind. Acts at 216. Any person claiming an interest in the liquor seized could appear before the court to show cause for "why the liquor seized should not be forfeited." *Id.* § 17, 1855 Ind. Acts at 216–17. Following trial, a "[j]udgment of forfeiture against any spirituous or intoxicating liquor" was treated "as a judgment, *in rem*," the validity of which could "not be contested or questioned in any action, in any court," or "by any person," except in cases of appeal. *Id.* § 31, 1855 Ind. Acts at 220–21.[19] Consistent with long-settled practice, the Liquor Act specified that any party to the proceedings could "demand a jury" trial. *Id.* § 17, 1855 Ind. Acts at 217.[20] And whether the property seized amounted to a nuisance in fact (*i.e.*, whether it fell into one of the statutory exceptions)

---

[18] The Act also called for certain criminal penalties for those persons found in unlawful possession of the offending contraband. Act of Feb. 16, 1855, ch. 105, §§ 9–13, 1855 Ind. Acts at 214–15. The fact that a statute allowed for personal penalties against a violator did not preclude the state from proceeding *in rem* when seeking a forfeiture. To the contrary, the longstanding practice under statutes that authorized "both a forfeiture *in rem* and a personal penalty" was that "the proceeding *in rem* stands independent of, and wholly unaffected by any criminal proceeding *in personam*." *The Palmyra*, 25 U.S. (12 Wheat.) 1, 14–15 (1827).

[19] This section of the Act embodied the traditional principle that a court's decree *in rem* could not be collaterally attacked "in another forum." *Gelston v. Hoyt*, 16 U.S. (3 Wheat.) 246, 312 (1818). Such other forums included state courts. *See Knœfel v. Williams*, 30 Ind. 1, 6, 7 (1868) (recognizing the prohibition on collateral attacks on a forfeiture judgment in a proceeding *in rem*).

[20] The Act prohibited habitual drunkards and persons "engaged in the unlawful manufacture or sale of intoxicating liquor" from serving as jurors. Act of Feb. 16, 1855, ch. 105, § 24, 1855 Ind. Acts at 219.

was a question for the jury to decide (if one was elected by either party).[21] *Id.* § 20, 1855 Ind. Acts at 218.

Published caselaw, regretfully, reveals little use of civil *in rem* forfeiture in Indiana during the latter half of the nineteenth century, whether to enforce the liquor laws or other penal statutes. Instead, criminal forfeiture seems to have been the preferred means of dispossessing offenders of their guilty property. *See Loesch v. Koehler*, 144 Ind. 278, 281, 41 N.E. 326, 327 (1895) (noting that statutes authorized the destruction of "gambling devices, intoxicating liquors, fish nets, traps, etc." upon "a judgment of guilt and of forfeiture").

Nevertheless, the *in rem* procedure surfaces periodically in the historical record from this period. *Loesch*, for example, decided by this Court in 1895, involved the "forfeiture and destruction" of horses "injured or diseased beyond recovery," not as a criminal "penalty for the violation of the law" but, rather, as a civil proceeding in the state's exercise of its police power. *Id.* at 280, 281–82, 41 N.E. at 327. While the constitutional guarantees applicable to "criminal proceedings" may not have applied, the Court held that "some notice, and a hearing before some tribunal, must be provided." *Id.* at 284, 41 N.E. at 328. Notably, the case was tried to a jury. *Id.* Only in 1909 do we find this Court deciding, for the first time (and apparently without argument by counsel), that an action for *in rem* forfeiture (brought under a 1907 liquor statute) was a "statutory proceeding" rather than "a civil case under the

---

[21] In forfeiture proceedings, courts have long distinguished contraband *per se* from derivative contraband. Contraband *per se* encompasses "articles which cannot be kept, exhibited, or used for any lawful or innocent purpose." *State v. Robbins*, 124 Ind. 308, 312, 24 N.E. 978, 979 (1890). Examples include such things as "spurious coin or bills, obscene pictures, books, or prints," *id.*, as well as "adulterated food, sawed-off shotguns, narcotics, and smuggled goods," *Bennis v. Michigan*, 516 U.S. 442, 459 (1996) (Stevens, J., dissenting). Derivative contraband, on the other hand, includes automobiles, tools, gaming apparatus, and limitless other things "which are not in and of themselves nuisances" but "which may be used for an illegal or immoral purpose." *Robbins*, 124 Ind. at 313, 24 N.E. at 980. When things are capable of two uses, one lawful and the other unlawful, courts cannot "upon mere view deprive them of their characteristics as property, and put them under legal condemnation." *State v. Derry*, 171 Ind. 18, 23, 85 N.E. 765, 767–68 (1908). Instead, the question has traditionally been left for the jury to decide. *See, e.g., People v. One 1941 Chevrolet Coupe*, 231 P.2d 832, 843 (Cal. 1951); *Keeter v. State*, 198 P. 866, 870 (Okla. 1921); *cf. State v. Intoxicating Liquor & Smith*, 55 Vt. 82, 83 (1883).

common law when the Constitution was adopted," and, therefore, falling outside the guarantee of trial by jury. *Campbell*, 171 Ind. at 708–09, 87 N.E. at 214–15.

We conclude from this historical survey that, while infrequently used, actions for *in rem* forfeiture of property implicated the right to trial by jury in Indiana, both before and after 1851.

In reaching this conclusion, we find no need to distinguish money from other property traditionally subject to *in rem* forfeiture, as the State would have us do. *See* Appellant's Br. at 9 & n. 1. We acknowledge that "the use of in rem process against property that was itself involved in illegal conduct has a far stronger historical pedigree than the use of in rem process against property that was merely acquired as a result of such conduct." Nelson, *supra*, at 2476; *see also United States v. Parcel of Land, Bldgs., Appurtenances & Improvements, Known as 92 Buena Vista Ave., Rumson, N.J.*, 507 U.S. 111, 121–22 (1993) (suggesting that the "seizure and forfeiture of proceeds of illegal drug transactions" was a novel concept under the 1978 amendments to the Comprehensive Drug Abuse Prevention and Control Act of 1970). But we reject the State's argument that the forfeiture of funds illegally obtained from or intended for criminal activity **never** existed in Indiana before 1851. In 1795, for example, the Northwest Territorial Government passed an act to suppress gaming, under which any person found to have held a lottery or raffle for purposes of raising money or other property was to "forfeit to the use of the Territory the whole sum of money or property proposed to be so raised or gained." Act of July 16, 1795, § VI, in *Laws of the Northwest Territory, 1788–1800*, at 276–77. The Indiana Territorial Government enacted a virtually identical law in 1807. *See* Act of Sept. 17, 1807, §§ 7, 16, in *Laws of Indiana Territory, 1801–1809*, at 375.

This historical precedent notwithstanding, we emphasize that the State didn't seek relief solely on the theory that the money seized was "proceeds" of a crime. Rather, the complaint also alleged that, whatever its provenance, the property should forfeit to the state because it was "intended" for crime or "used to facilitate" crime. App. Vol. II, pp. 14–15. In other words, the State charges that the money was used or intended for

use as the instrument of crime. The allegation that the money is "proceeds," as we understand it, means that it was received in exchange for drugs, rendering it an instrumentality of a criminal drug deal. *See* Nelson, *supra*, at 2480 (money used in a drug sale "is as much a part of the illegal transaction as the drugs themselves"). And the forfeiture of the instrumentality of a crime falls squarely within the historical tradition of *in rem* forfeiture.[22]

## B. Even if no cause of action existed in 1851, the forfeiture here is akin to an action at law.

While the historical record strongly suggests that Indiana continued the common-law tradition of jury trials for *in rem* forfeitures, we acknowledge that the evidence is largely circumstantial. But, even if no cause of action existed in 1851, we have little trouble concluding that the forfeiture here is **not**, as the State contends, akin to the equitable disgorgement of illegally obtained profits.

Disgorgement is a form of restitution in which a defendant is ordered to surrender gains unjustly obtained, even if the plaintiff suffered no loss. *See Wenzel v. Hopper & Galliher, P.C.*, 830 N.E.2d 996, 1001 (Ind. Ct. App. 2005) (explaining that an agent who breached a fiduciary duty must disgorge their compensation "without a requirement for the principal to demonstrate financial loss"). As other courts have pointed out, a "key distinction between restitution and forfeiture is the recipient of payments made to satisfy those orders." *Zambarano v. Ret. Bd. of Emps. Ret. Sys. of State*, 61 A.3d 432, 439 (R.I. 2013). Restitution of ill-gotten gains is made "to the individual at whose expense the defendant was unjustly enriched." *Id.* So, while "equity practice" has "long authorized courts to strip wrongdoers of their ill-gotten gains," courts have "restricted the

---

[22] A different analysis may have been necessary were the State seeking forfeiture of money alleged to be "proceeds of proceeds" traceable through a series of bargains. But, here, the State's appellate brief indicates that it believes the money was both "an instrumentality **and** proceeds from Kizer's illegal drug trade." Appellant's Br. at 13 (emphasis added). We therefore leave the question of remote proceeds for another day.

remedy to an individual wrongdoer's net profits to be awarded for victims." *Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 1942 (2020). Under Indiana's statute, by contrast, forfeited money first pays for the attorney's fees, with the remainder distributed to the prosecuting attorney (to offset expenses), law enforcement, and various funds administered by the state. I.C. § 34-24-1-4(d)(3).

Second, equitable restitution remedies developed on a distinctly *in personam* theory, rather than the *in rem* theory on which civil forfeiture proceeds. Before abolition of the distinction between actions at law and suits in equity, the common-law courts traditionally decided disputes over the ownership of property simply by determining which party held "good title at law." 1 Dan B. Dobbs, Law of Remedies § 4.3(1), at 586 (2d ed. 1993). This limited the relief available to a plaintiff who, for example, had been unjustly induced to give away title. In the face of such injustices, the courts of equity sidestepped legal formalities by acting "upon the person of the defendant" rather than deciding the question of title. *Id.* § 4.3(1), at 587. While the law "declared rights in things," equity "commanded the defendant's conscience to act" by ordering them, for example, to reconvey the property they had inequitably acquired. *Id.* § 2.2, at 74. Civil forfeiture's *in rem* mode of procedure, by contrast, acts directly "against inanimate objects for participation in alleged criminal activity, regardless of whether the property owner is proven guilty of a crime—or even charged with a crime." *Serrano v. State*, 946 N.E.2d 1139, 1140 (Ind. 2011). It's clear, then, that civil forfeiture is not traceable to the roots of equitable restitution.

Finally, it's worth reciting the long-held "general rule" that "a court of equity will not interfere to give relief against a statutory forfeiture" like the one we're presented with here. *See* Tiedeman, *supra*, § 155, at 277; *see also* Dillon, *supra*, § 286, at 297–98 (observing that a statutory forfeiture "cannot be relieved against in equity"); *Liu*, 140 S. Ct. at 1941 (quoting *Marshall v. City of Vicksburg*, 82 U.S. 146, 149 (1872)) (reciting the principle that "equity never 'lends its aid to enforce a forfeiture or penalty'"). A contrary rule, after all, would stand in clear "contravention of the direct expression of the legislative will." *Clark v. Barnard*, 108 U.S. 436, 457 (1883).

In sum, we conclude that the present action for *in rem* forfeiture of money as the instrument and proceeds of crime is readily analogous to the traditional common-law forfeiture of property used in violation of the law—not to equitable disgorgement. And, in keeping with Indiana's constitutional guarantee, this is an essentially legal action that triggers the right to trial by jury.

## Conclusion

For the reasons above, we hold that a claimant in an action brought under Indiana's civil forfeiture statute has a constitutional right to trial by jury. We thus affirm the trial court and remand for trial by jury.

Rush, C.J., and Massa, Slaughter, and Molter, JJ., concur.

ATTORNEYS FOR APPELLANT
Theodore E. Rokita
Attorney General of Indiana

Justin F. Roebel
Supervising Deputy Attorney General
Indianapolis, Indiana

Andrew A. Kobe
Section Chief, Criminal Appeals
Office of the Indiana Attorney General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES
Marie Miller
Samuel B. Gedge
Institute for Justice
Arlington, Virginia